UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | No.    14-CR-10201-DJC |
| v. | Violations: |
| 1.    ERIC MCPHAIL | Conspiracy |
| 2.    DOUGLAS PARIGIAN | (18 U.S.C. § 371) |
| | Securities Fraud |
| | (15 U.S.C. §§ 78j(b) & 78ff; 17 C.F.R. § 240.10b-5) |
| | False Statements |
| | (18 U.S.C. § 1001) |
| | Aiding and Abetting |
| | (18 U.S.C. § 2) |
| | Criminal Forfeiture Allegations |
| | (18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. § 2461(c)) |

## FIRST SUPERSEDING INDICTMENT

THE GRAND JURY CHARGES THAT:

### Certain Relevant Persons and Entities

At all times material to this Indictment:

1.    ERIC MCPHAIL was a person living in Waltham, Massachusetts.

2.    DOUGLAS PARIGIAN was a person living in Lowell, Massachusetts.

3.    Persons B – G were residents of Massachusetts.

4.    American Superconductor Corporation ("AMSC") was a corporation formed in Delaware

and headquartered in Devens, Massachusetts.  AMSC produced, among other things,

superconducting wire and hardware and software for the wind power industry.  AMSC's

fiscal year began on April 1 and ended on March 31 of a given year.

5.     Shares of AMSC were securities, as that term is defined in 15 U.S.C. § 78c(a)(10),
       registered with the United States Securities and Exchange Commission ("SEC") pursuant
       to § 12(g) of the Securities Exchange Act of 1934, and publicly traded on the National
       Association of Securities Dealers Automated Quotations exchange ("NASDAQ").
       NASDAQ was a national securities exchange.

6.     Person A was a resident of Massachusetts.  Between in or about 2004 and 2011, Person A
       was an executive at AMSC.

7.     Sinovel Wind Group Co., Ltd. ("Sinovel") was a Chinese company engaged in the
       development and sale of wind turbines.

### General Allegations Regarding the Conspiracy
### Charged in Count One and the Scheme to Defraud

#### Objectives

8.     The primary purpose and objective of the conspiracy was for DOUGLAS PARIGIAN
       and others to make money by buying and selling shares in AMSC, and options on such
       shares, on the basis of material, nonpublic information received from ERIC MCPHAIL,
       who had obtained the information from Person A.

#### Manner & Means

9.     The manner and means by which the conspirators accomplished the objectives of the
       conspiracy, and of the scheme to defraud, included, among others, the following:

       a.     MCPHAIL had a relationship with Person A such that MCPHAIL owed Person A
              a duty of trust and confidence, that is, their relationship involved a history,
              pattern, and practice of sharing confidences and an understanding that information
              conveyed between them was to remain confidential.  MCPHAIL knew and
              reasonably should have known that Person A expected MCPHAIL to keep

confidential the information he received from Person A.

b.    Over the course of this relationship, Person A revealed to MCPHAIL material, nonpublic information about AMSC's quarterly earnings and other business activities ("Inside Information").

c.    In a violation of his duty to Person A, at various times MCPHAIL used email and other means to disseminate the Inside Information to his friends, including PARIGIAN and certain others, with the intent that they profit by buying and selling shares in AMSC, or options on such shares, on the basis of the Inside Information.

d.    PARIGIAN and others, who knew or should have known that the Inside Information was material and nonpublic and had been disseminated in violation of a fiduciary or similar duty, bought and sold shares in AMSC, and options on such shares, based on the Inside Information and profited from this trading.

e.    As PARIGIAN knew at the time, MCPHAIL expected to receive, and received, a benefit from disclosing the Inside Information to PARIGIAN and others.

**Overt Acts Committed in Furtherance of the Conspiracy Charged in Count One and as Part of the Conspirators' Scheme to Defraud**

10.    Person A was a senior executive at AMSC who, pursuant to his employment there, was entrusted with material, nonpublic information about AMSC that he knew was supposed to remain confidential.

11.    By in or about 2009, MCPHAIL and Person A had a relationship of trust and confidence, including a history, pattern, and practice of sharing professional and personal confidences, and the two men had an understanding that information conveyed between them was to remain confidential.  MCPHAIL knew that Person A had a senior position at

AMSC and had access to material, nonpublic information about the company that was supposed to remain confidential. MCPHAIL knew and reasonably should have known that Person A expected that MCPHAIL would keep confidential information he received from Person A.

### A. MCPHAIL's Use of Email to Convey Material, Nonpublic Information Misappropriated from Person A

12. Beginning in or about July 2009, in the course of their relationship, Person A disclosed material, nonpublic information about AMSC to MCPHAIL.

13. Also beginning in or about July 2009, MCPHAIL used email to disseminate to PARIGIAN and Persons B – E the material, nonpublic information about AMSC that MCPHAIL had obtained from Person A during their frequent interactions. MCPHAIL and PARIGIAN were good friends. PARIGIAN was aware of the relationship between MCPHAIL and Person A, and knew that Person A was an executive at AMSC.

14. For example, on or about July 9, 2009, MCPHAIL emailed PARIGIAN, as well as Persons B, C, and D, with a copy to Person E. Responding to an earlier email from Person B recommending a particular penny stock, MCPHAIL said, in part, "Try this one . . . AMSC . . . watch it on July 30th."

15. In a later reply from Person D to MCPHAIL on or about July 10, 2011, copying PARIGIAN and others, Person D said, in part:

> I appreciate your leads and I was just doing my due diligence and if you looked at that attachment about the stock you sent, you'd see that stock looks like a dog as our good buddy Gordon Gekko would say. So, I'm supposed to look at this research that clearly says don't buy, and go by my good buddy that says, "trust me" I can't divulge my info? . . . .
>
> Just be ready on August 1st if the stock bombs to take a beating!

16.     On or about July 16, 2009, AMSC issued a press release saying that it would publish first

        quarter financial results on July 30, 2009, before the market opened.

17.     On or about July 30, 2009, before market opening, AMSC announced positive earnings

        for the first quarter. On the news, AMSC stock closed that day at $32.13 per share, up

        from the prior closing price of $26.28.

18.     At or about 10:05 am on or about July 30, 2009, Person B sent an email to PARIGIAN,

        MCPHAIL and others, bearing the subject line, "AMSC," saying, "Wow!! When do we

        get out? Eric, Concord is on me. No need to bring your checkbook." "Concord" is a

        reference to a local golf course. A few minutes later, Persons B, C and D sent emails

        revealing at what price they sold their shares. Person D wrote, at or about 11:31 am,

        "Sold 1000 holding 500. . .guess @ owe ya a fresca Eric!"

19.     While in possession of material, nonpublic information received from MCPHAIL,

        between on or about July 9, 2009, and July 24, 2009, PARIGIAN bought 1200 shares of

        AMSC stock. On or about July 30-31, 2009, after AMSC's earnings announcement,

        PARIGIAN sold 1000 shares of AMSC, netting about $9,000.

20.     On or about the evening of July 30, 2009, after further email exchanges about AMSC,

        MCPHAIL emailed PARIGIAN and others, "Nice profitable day for the boys. So when

        should I report in on which restaurant and massage parlor I want to be treated to?"

21.     As another example, on or about September 29, 2009, at or about 12:38 am, MCPHAIL

        emailed PARIGIAN and Person D:

                Well boys. . . . went to the Sox game with a friend of mine tonight.
                He seems to think that AMSC has a $100 Million deal with China
                that should be signed very shortly. It could be done in the next few
                days. . . if it is not done/announced by Thursday, it will not be
                announced until the week of the 12th because all of China shuts
                down for vacation for 10 days- starting Friday. This

> announcement should spike them close to 10%. Furthermore, circle
> October 29[th] for the next big day . . .it could/should be as good as
> the last one, provided the market cooperates that day.
>
> I like Pinot Noir and love steak . . . . looking forward to getting
> paid back.
>
> Good luck. . . . SHHHHHHHHHHHHH!!!!!!!!!!!!!!!!

22.  Later that day, PARIGIAN replied to MCPHAIL by email at or about 6:50 am, "I will
     take you for a nice dinner at Grill 23."

23.  On or about September 29, 2009, beginning at or about 9:30 am, while in possession of
     the above-referenced material, nonpublic information received from MCPHAIL,
     PARIGIAN bought a total of 1100 shares of AMSC stock.

24.  Later on or about September 29, 2009, after the markets closed, AMSC issued a press
     release announcing a $100,000,000 contract with Sinovel. The next day, AMSC's stock
     price closed at $33.50, up from $30.56.

25.  On or about September 30, 2009, PARIGIAN sold 800 shares of AMSC stock, about 100
     of which had been purchased on September 29, 2009. On those 100 shares, PARIGIAN
     earned a net gain of about $750.

26.  On or about September 29, 2009, at or about 10:04 pm, MCPHAIL also emailed
     PARIGIAN and others about AMSC's upcoming quarterly earnings report, due to be
     released on October 29, 2009. The email said,

> Hopefully there are no terrorist attacks between now and the 29[th] . .
> . could be another bomber of a day. Similar to the end of July. I
> could take 4 of these announcements a year for the next dozen
> years.

27.  PARIGIAN replied by email a short time later, "I will be taking most my gains and
     putting it ALL on Options before Oct. 29. I just wish I knew what an Option was."

28.   On or about October 15, 2009, AMSC issued a press release announcing that it would

release quarterly earnings on October 29, 2009.

29.   On or about October 16, 2009, PARIGIAN secured authorization from his brokerage to

trade options in his brokerage account.

30.   On or about October 22, 2009, MCPHAIL emailed PARIGIAN and others, "Certainly

looks like today may be a good buying opportunity for AMSC, T minus one week."

31.   On or about October 29, 2009, at or about 8:57 am, MCPHAIL sent another email,

copying PARIGIAN and others, saying, "Please keep your arms and feet inside. . . .enjoy

the ride!!" A short time later, AMSC announced that its revenues for the second quarter

of 2009 were 85% higher than revenue in the same quarter of 2008. AMSC's share price

closed at $35.34, up from $28.54 at the opening bell.

32.   While in possession of the above-referenced material, nonpublic information received

from MCPHAIL, between on or about September 29, 2009, and October 28, 2009,

PARIGIAN bought approximately 1,180 shares of AMSC stock and 60 call options on

that stock. A call option is essentially a contract that allows investors to bet that a stock

will increase in price within a specified period.

33.   On October 29-30, 2009, following AMSC's earnings announcement, PARIGIAN sold

1,480 shares of AMSC stock and the 60 call options, netting about $5,952.36.

34.   As another example, on or about July 28, 2010, at or about 10:13 pm, MCPHAIL emailed

PARIGIAN and Persons C and D:

> Just had dinner with my friend. . .expect to go up 4-5 tomorrow.
> Sorry for the delay but don't have a dog in the fight so wasn't too
> concerned on the news. Quarterly earnings will beat everything
> and yearly estimates going up across the board. Hopefully you
> guys are still in the game- you will make money tomorrow.

35.     PARIGIAN replied by email less than an hour later, "I have 1500 shares that I'm looking to unload," to which MCPHAIL replied by email, "Looks like you will make a good score tomorrow."

36.     On or about July 29, 2010, AMSC announced positive quarterly earnings, but AMSC's share price declined by about two dollars per share.  PARIGIAN emailed MCPHAIL that day, "Thanks Buddy.  Any chance you could call your 'friend' and ask him to throw out an anchor to stop this freefall.  Thanks again."

37.     At certain times during the course of the conspiracy and the scheme to defraud, PARIGIAN solicited MCPHAIL to obtain material, nonpublic information about AMSC's finances.  For example:

        a.      On or about October 26, 2010, at or about 2:55 pm, PARIGIAN emailed MCPHAIL, "AMSC is announcing quarterly reports on November 2.  Any thoughts?"  MCPHAIL replied, "They are going to be good."

        b.      On or about December 15, 2010, at or about 4:21 pm, PARIGIAN emailed MCPHAIL, "Is AMSC a buy at 29.50?"  MCPHAIL replied, I do not know.  I won't talk to him until next week either."

38.     In an effort to conceal their scheme, MCPHAIL, PARIGIAN and others took steps to keep secret the material, nonpublic information MCPHAIL provided, and to otherwise hide their illegal activities.  For example:

        a.      Following an email tip from MCPHAIL on or about September 29, 2009, Person D emailed MCPHAIL, copying PARIGIAN, "Then you should tell Quinn too . . . think about that jump!"  MCPHAIL replied at or about 10:17 am to both men, "I don't know how safe the info will remain at that point?  Thoughts?"

b.    On or about September 30, 2009, during an email discussion about AMSC among MCPHAIL, PARIGIAN, and Persons B, C, and D, at or about 1:40 pm MCPHAIL emailed the group, "Remember, no AMSC comments on the other thread."

c.    On or about November 30, 2009, PARIGIAN, MCPHAIL, Persons B, C, D, and two others participated in an email chain concerning a recent tip MCPHAIL had provided, based on material, nonpublic information obtained from Person A, about AMSC's anticipated earnings announcement in February 2010.  One of the email participants who did not routinely appear on MCPHAIL's emails about AMSC emailed the group, "Is this info we can act on or what?"  PARIGIAN replied at or about 9:12 pm, "Yes.  We have been buying the stock at 31.75 and selling at 34 for the past 4 months."  Person C replied to the group, "Don't copy me on emails like this again."  A few moments later, in replying to a teasing email from PARIGIAN, Person C wrote, "No no no.  I still welcome the information. Just not through this medium."

d.    On or about November 8, 2010, replying to an email discussion between Persons D and E about AMSC's stock price, PARIGIAN emailed Person D, "I am deleting all my emails that make any mention of AMSC."

**B.    MCPHAIL's Dissemination to PARIGIAN and Others of Material, Nonpublic Information in March and April 2011**

39.    From in or about fiscal year 2008 through 2010, Sinovel was AMSC's primary customer for wind turbine hardware and related technology. AMSC's sales to Sinovel generated approximately 70 percent of AMSC's revenue.

40.     At the end of the fourth quarter of AMSC's fiscal year ended March 31, 2011, AMSC
        and Sinovel negotiated at length about upgrading the technology in certain AMSC
        products; whether Sinovel would accept about $65,000,000 in products, scheduled for
        delivery by March 31, 2011, if the upgrades were not made; and when Sinovel would pay
        down about $62,000,000 in outstanding receivables.

41.     On or about Thursday, March 31, 2011, Sinovel told AMSC that Sinovel would not
        accept additional shipments or pay down its overdue accounts receivable balance before
        the end of the quarter. Only a handful of AMSC executives were aware of this material,
        nonpublic information, and they were required to keep it confidential.

42.     On or about March 31, 2011, Person A, in his role as a senior executive at AMSC, was
        made aware of the breakdown in negotiations with Sinovel.

43.     On or about Thursday, March 31, 2011, and Friday, April 1, 2011, Person A confided in
        MCPHAIL about the problems at AMSC.

44.     On or about Friday, April 1, 2011, and on or about Saturday and Sunday, April 2-3, 2011,
        MCPHAIL conveyed this material, nonpublic information to PARIGIAN and others.

45.     On or about Monday, April 4, 2011, PARIGIAN liquidated his existing holdings in
        AMSC and bought 330 put options on AMSC stock. A "put" is essentially a contract that
        allows investors to bet that a stock will drop in price within a specified period.

46.     Also on or about April 4, 2011, Person F bought 300 put options on AMSC stock and
        Person G bought 230 put options on the stock.

47.     On or about Tuesday, April 5, 2011, at or about 4:00 pm, AMSC publicly announced its
        anticipated financial results for its fourth quarter and the fiscal year ended March 31,
        2011. The announcement indicated that Sinovel had refused to accept certain shipments

and that AMSC expected Sinovel to reduce its level of inventory before accepting further shipments. As a result, the announcement disclosed, AMSC expected its revenues for the fourth quarter and for fiscal 2010, and its earnings, to be substantially below prior forecasts.

48. When the markets opened the next day, Wednesday, April 6, 2011, AMSC's common share price dropped 42 percent, from a closing price of $24.88 per share on April 5, 2011, to a closing price of $14.47 per share on April 6, 2011.

49. In the days and weeks following the announcement, PARIGIAN and Persons F and G exercised their put options on AMSC stock. PARIGIAN realized a profit of about $267,881 and avoided losses of about $10,800 by selling his remaining AMSC shares before AMSC's April 5 announcement. Persons F and G realized profits of about $192,117.45 and $180,916.58, respectively.

50. On or about April 8, 2011, in an email MCPHAIL sent to Parigian and Persons B – D, among others, MCPHAIL referred to portions of the group having gone out to dinner the night before and said, "What's wrong with celebrating my achievements?"

51. In total, PARIGIAN and Persons B – G made approximately $720,000 in illicit profits from trading shares of AMSC, and options on those shares, based on material, nonpublic information provided by MCPHAIL.

## COUNT ONE

### (Conspiracy to Commit Offenses Against the United States)

52. The Grand Jury re-alleges and incorporates by reference paragraphs 1-51 of this Indictment, and further charges that:

53. In or about and between July 2009 and April 2011, in the District of Massachusetts and elsewhere, the defendants,

1. **ERIC MCPHAIL and**
2. **DOUGLAS PARIGIAN,**

together with others known and unknown to the Grand Jury, conspired to commit offenses against the United States, to wit, knowingly and willfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, directly and indirectly using and employing manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities in contravention of Rule 10b-5 (17 C.F.R. § 240.10b-5) of the Rules and Regulations promulgated by the U.S. Securities and Exchange Commission, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which would and did operate as a fraud and deceit, in connection with the purchase and sale of securities, to wit, shares and options on shares in American Superconductor Corporation, in violation of 15 U.S.C. §§ 78j(b) & 78ff(a), and 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2.

All in violation of 18 U.S.C. § 371.

## COUNT TWO

### (Securities Fraud)

54.   The Grand Jury re-alleges and incorporates by reference paragraphs 1-51 of this

Indictment and further charges that:

55.   In or about and between July 2009 and April 2011, in the District of Massachusetts and

elsewhere, the defendants,

**1.      ERIC MCPHAIL and**
**2.      DOUGLAS PARIGIAN,**

did knowingly and willfully, by the use of means and instrumentalities of interstate

commerce, the mails, and the facilities of national securities exchanges, directly and

indirectly use and employ manipulative and deceptive devices and contrivances in

connection with the purchase and sale of securities in contravention of Rule 10b-5 (17

C.F.R. § 240.10b-5) of the Rules and Regulations promulgated by the United States

Securities and Exchange Commission, and did (a) employ a device, scheme and artifice

to defraud, (b) make untrue statements of material facts and omit to state material facts

necessary in order to make the statements made, in light of circumstances under which

they were made, not misleading, and (c) engage in acts, practices and a course of business

which would and did operate as a fraud and deceit, in connection with the purchase and

sale of shares and options on shares in American Superconductor Corporation

("AMSC"), specifically, by willfully engaging in a scheme to misappropriate material,

nonpublic information about AMSC's finances and business activities and, while in

possession of that information, to profit by buying and selling shares, and options on

shares, of AMSC stock.

All in violation of 15 U.S.C. §§ 78j(b) & 78ff(a), 17 C.F.R. § 240.10b-5, and 18 U.S.C.

§ 2.

## COUNT THREE

### (False Statements)

56.   The Grand Jury re-alleges and incorporates by reference paragraphs 1-51 of this
Indictment and further charges that:

57.   On or about May 10, 2012, in the District of Massachusetts, the defendant,

### 2.   DOUGLAS PARIGIAN,

did knowingly and willfully make materially false, fictitious and fraudulent statements
and representations in a matter within the jurisdiction of the executive branch of the
Government of the United States, to wit, telling agents of the Federal Bureau of
Investigation, in the course of an interview conducted in furtherance of a federal criminal
investigation, that he did not receive stock tips or other inside information about
American Superconductor Corporation ("AMSC"); that he did not know anyone else who
invested in ASMC stock; and that he did not know anyone who worked for AMSC; when
in fact, as he then knew and believed, each of those statements was false.

All in violation of 18 U.S.C. § 1001(a)(2).

## CRIMINAL FORFEITURE ALLEGATION

(18 U.S.C. § 981(a)(1)(c); 28 U.S.C. § 2461(c))

58.   The Grand Jury further charges that:

59.   Upon conviction of one or more of the offenses charged in Counts One and Two of this

Indictment, the defendants

**1.   ERIC MCPHAIL and**
**2.   DOUGLAS PARIGIAN,**

shall forfeit to the United States, jointly and severally, pursuant to 18 U.S.C.

§ 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes

or is derived from proceeds traceable to such offense.

60.   If any of the property described above, as a result of any act or omission by the

defendants

    a.   cannot be located upon the exercise of due diligence;

    b.   has been transferred or sold to, or deposited with, a third party;

    c.   has been placed beyond the jurisdiction of the Court;

    d.   has been substantially diminished in value; or

    e.   has been commingled with other property which cannot be subdivided without

      difficulty,

it is the intention of the United States, pursuant to 28 U.S.C. § 2461(c), incorporating 21

U.S.C. § 853(p), to seek forfeiture of any other property of the defendants up to the value

of the property described in paragraph 54 above.

All pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

A TRUE BILL,

_____
FOREPERSON OF THE GRAND JURY


_____
ANDREW E. LELLING
Assistant U.S. Attorney


DISTRICT OF MASSACHUSETTS, January 21, 2015
Returned into the District Court by the Grand Jury Foreperson and filed.

_____
Deputy Clerk   1/21/15 @ 12:05pm