UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| ) | |
| UNITED STATES ) | |
| ) | |
| v. ) | No.  14-cr-10201-DJC |
| ) | |
| DOUGLAS A. PARIGIAN ) | |
| _____) | |

## **MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS**

This Memorandum of Law is submitted in support of Defendant Douglas Parigian's ("Parigian") Motion to Dismiss.   In this insider trading case, the Government alleges that Co-Defendant Eric McPhail ("McPhail") misappropriated nonpublic information disclosed to him by a corporate executive of American Superconductor Corporation ("AMSC") by further disclosing the information to several of his golfing buddies, including Parigian, who then traded on the information.   Only Parigian and McPhail were indicted.   None of the other members of the golfing group who engaged in the same conduct as Parigian were indicted.

On July 9, 2014 Parigian was indicted on: Count 1 – Conspiracy; Count 2 – Securities Fraud; and Count 3 – Making False Statements.   Parigian respectfully moves this Court pursuant to Fed. R. Crim. P. 12(b)(3)(B) and 8(a) to dismiss Counts One and Two of the Indictment for failure to allege a crime.

# Contents

Preliminary Statement ................................................................................................ 3

Facts As Alleged ......................................................................................................... 4

Legal Standard for Insider Trading by a "Tippee" .................................................... 5

No Scienter ................................................................................................................. 7

No Classical Insider Trading

    Parigian HadNo Duty to AMSC ........................................................................ 9

    McPhail Had No Duty to AMSC ....................................................................... 9

No Misappropriation Theory of Insider Trading

    Parigian Had No Duty to the AMSC Executive ................................................ 9

    Parigian Had No Duty to McPhail .................................................................... 9

    McPhail Had No Duty to the AMSC Executive ............................................... 10

There Was No Fiduciary-Like Relationship .............................................................. 11

The AMSC Executive Did Not Expect the Information To Be Kept Confidential ................. 12

SEC Rule 10b5-2(b)(2) Does Not Create a New Class of Crime ............................... 13

No Personal Benefit to the Corporate Insider From the Disclosure ........................... 14

 Parigian Did Not Know of Any Personal Benefit ...................................................... 17

McPhail Did Not Recxeive a Personal Benefit from Parigian .................................... 18

The Information Was Already Public at the Time of the Trades ................................. 19

No Prosecution Of Others .......................................................................................... 21

Conclusion .................................................................................................................. 22

Preliminary Statement

Counts One and Two of the Indictment (conspiracy to commit securities fraud and securities fraud) fail to charge a crime.  In this case, the allegations of the sharing of information about AMSC Corporation among a group of golfing buddies does not constitute a crime. Parigian was a second tier tippee, a 'remote' tippee, if you will.  The corporate insider disclosed the information to McPhail, and McPhail passed the information on to several golfing buddies. Parigian did not receive any information from the corporate insider; and he did not breach any fiduciary or fiduciary-like duty.  Likewise, McPhail did not breach any fiduciary or fiduciary-like duty.   In addition, the corporate insider did not, and is not alleged to have, receive a personal benefit from his disclosure to McPhail.   Nor does the Government allege that Parigian knew of any benefit to the insider.

The Government's position that Parigian is criminally responsible would make insider trading effectively a strict liability crime by imposing criminal sanctions on a person with no knowledge whether an insider's disclosure of information violated his fiduciary responsibility. This position has repeatedly been rejected by the United States Supreme Court.

Further, selective prosecution warrants dismissal.  The Government has not indicted other members of the golfing group who engaged in the same conduct as Parigian.  Nor has the Government indicted any of the other people who traded 3.4 million shares on the same day as Parigian (the day before the information became officially public).

Facts As Alleged

The AMSC corporate executive passed inside information to his golfing buddy, McPhail. McPhail, in turn, passed the information on to other golfing buddies, including Parigian. Parigian, who did not receive the information from the corporate insider is what is known as a "remote tippee."

The Government does not allege that the corporate executive ever asked McPhail to keep the information confidential.  Instead, the Government alleges that "the two men had an understanding that information conveyed between them was to remain confidential" and that McPhail "knew and reasonably should have known that [the corporate executive] expected that McPhail would keep confidential information he received" [*Indictment* §11].  In the absence of statutory or case law supporting its theory, the Government relies on SEC rule 10b-5(2)(b)(2) to find a crime.  This Rule is discussed in detail *infra*.

The Government does not allege that McPhail identified to Parigian and the other golfing buddies that the source of the information was a corporate executive at AMSC.  Nor does the Government allege that McPhail told Parigian that the source of the information asked him to keep the information confidential.  Instead, the Government alleges that Parigian knew or should have known that the information had been disseminated "in violation of a fiduciary or similar duty".  [*Indictment* §9d]

Notably absent from the Indictment is the fact that the corporate executive was also freely passing along the inside information to others including his in-laws, David Cancian, and likely others.  See, for example, SEC v. David Cancian, 1:14-cv-11007-LTS.

Legal Standard for Insider Trading by a "Tippee"

Trading on the basis of nonpublic information is not per se illegal.  A person who receives nonpublic information and trades does not, without more, commit securities fraud.  As noted in United States v. O'Hagan, 521 U.S. 642, 660 (1979), there is no duty to refrain from trading merely because one has received material nonpublic information.

The duty to abstain from trading arises only when the following factors are present: (1) the trader has knowledge that the corporate insider has breached a fiduciary duty to the corporation by disclosing the information; and (2) the trader acts with scienter.  As we will see, an insider-source breaches the fiduciary duty to the corporation **only when** he or she receives a personal benefit from disclosing the information to an outsider.  And scienter requires that the tippee-trader knows that the corporate insider has received a personal benefit from his disclosure of confidential information.

These elements were reiterated most recently in United States v. Newman and Chiasson, No. 13-1837cr and 13-1917cr (2nd Cir. December 10, 2014), discussed in greater detail *infra*.  Again, the mere receipt of nonpublic information from a corporate insider does not give rise to a duty to refrain from trading.  The recipient of information must abstain from trading only when he knows that the insider has breached a fiduciary duty.  And an insider breaches a fiduciary duty only when he or she has obtained a personal benefit from disclosing the confidential information.  "The test for determining whether the corporate insider breached his fiduciary duty is whether the insider personally will benefit, directly or indirectly, from his disclosure.  Absent some personal gain, there has been no breach of duty…"  Newman, p.11, citing Dirks v. SEC, 463

U.S. 646 (1983).  "…the corporate insider has committed no breach of fiduciary duty unless he receives a personal benefit in exchange for the disclosure."  Newman, p. 13-14.

Further, and very important here, unless the tippee-trader knows about the insider's receipt of a personal benefit in exchange for disclosing the information, then the tippee-trader does not act with a criminal intent.  "For purposes of insider trading liability, the insider's disclosure of confidential information, standing alone, is not a breach.  Thus, without establishing that the tippee knows of the personal benefit received by the insider in exchange for the disclosure, the Government cannot meet its burden of showing that the tippee knew of a breach."  Newman, p. 14.  See also Dirks, at 656 n.15; Chiarella v. United States, 445 U.S. 222, 235 (1980).  The Second Circuit has rejected the Government's position that a tippee can be liable merely by having knowledge that the insider breached a duty of confidentiality.  There must also be a breach of a fiduciary duty, meaning that there must have been a personal benefit to the insider, and knowledge of that benefit by the tippee.  "…[w]e find no support for the Government's contention that knowledge of a breach of the duty of confidentiality without knowledge of the personal benefit is sufficient to impose criminal liability."  Newman, p. 15-16. "Accordingly, we conclude that a tippee's knowledge of the insider's breach necessarily requires knowledge that the insider disclosed confidential information in exchange for personal benefit." Id., p. 16-17.

The Government is required to allege every essential element of the offense in the Indictment.  Almendarez-Torres v. United States, 523 U.S. 224, 228 (1998).  This includes all of the components of the mens rea, or culpable mind.  United States v. Thompson, 356 F.2d 216, 226 (2nd Cir. 1965) (indictment defective for omitting intent).  In this case, the Superceding Indictment fails to allege that the corporate insider who tipped McPhail received a personal gain.

The Superceding Indictment also fails to allege that Parigian knew of a personal gain to the insider.

No Scienter

It is a bedrock principle of our justice system that a criminal conviction requires a culpable state of mind.  Morissette v. United States, 342 U.S. 246, 250, 271 (1952).  The Supreme Court has made it clear that trading on material nonpublic information is not unlawful in itself.  Chiarella v. United States, 445 U.S. 222, 233 (1980).   One element that distinguishes lawful trading from unlawful trading is the trader's intent and knowledge.   A culpable state of mind in the context of securities fraud is "a realization on the defendant's part that he was doing a wrongful act under the securities law."  United States v. Cassese, 428 F.3d 92, 98 (2nd Cir. 2005).

The severity of penalties imposed for certain actions is a factor to be assessed in determining the mens rea requirement of a statute.  Staples v. United States, 511 U.S. 600, 616-617 (1994).  The SEC penalties of disgorgement, 100% penalty, and prejudgment interest are severe.  The Sentencing Guidelines recommended sentences and enhancements, as well as the statutory maximum sentence are also severe.  The requisite state of mind for insider trading is scienter.  SEC v. Obus, 693 F.3d 276, 285 (2nd Cir. 2012).

Negligence does not meet the requirement of intent; only actual intent or a high degree of recklessness suffices.  Obus at 286.   In arguing that Parigian must have known the information was "inside information," the Government makes much of the fact that Parigian is alleged to have made profits of over $290,000 by trading in April 2011.  The Government cunningly implies that Parigian knew he would make a large profit by trading in puts in April 2011 and that scienter can be inferred from such knowledge.   That inference is not supported by the

allegations in the Complaint.   Parigian had no way of knowing how much the stock would go

down on April 6 or how much he would profit.

This is important.  Parigian had "ups and downs" with McPhail's information.  The tips

were often wrong and Parigian sustained a number of actual losses on AMSC stock.  For

example, a January 11, 2010 email from McPhail stated "Going to be good" turned out to be

wrong and the stock went down.  To a golfing buddy such as Parigian, that kind of hit-or-miss

information was not indicative of inside information having originated from a corporate insider

with material nonpublic information.

Note also that the golfing group had a history of giving each other recommendations on

stocks tips.   On July 8, 2009 Douglas Clapp (another member of the golfing group) emailed the

group saying "Watch what this penny stock WGRL does tomorrow.  You'll be amazed."

Securities and Exchange Commission v. Eric McPhail, et al., 1:14-cv-12958-RWZ, *Complaint*

¶39.  Thus, the fact that McPhail had recommendations regarding AMSC was not suspect,

especially considering that others in the group also had recommendations; and especially

considering that McPhail's recommendations were often wrong.  "To prove scienter, a plaintiff

must show either a conscious intent to defraud or a high degree of recklessness."  SEC v. Ficken,

546 F.3d 45, 47 (1st Cir. 2008).  The failure to inquire as to the source of the information here, at

best, shows negligence.  But negligence is not enough. A culpable state of mind in the context of

securities fraud is "a realization on the defendant's part that he was doing a wrongful act under

the securities law."  United States v. Cassese, 428 F.3d 92, 98 (2nd Cir. 2005).

An ordinary reasonable person would not know that it can be considered insider trading if

a person gets information from a source outside the company.  This is not surprising.  While

those in the securities industry may be intimately familiar with the particulars of securities fraud,

the average layperson is not.  That trading on information from an outsider can be insider trading

is counterintuitive.  Indeed, it was not until O'Hagan when the courts first supported the

misappropriation theory of insider trading that an outsider could be held liable.  Until then,

insider trading was just that: trading by insiders.  The law, of course, has evolved since then.

No Classical Insider Trading

1.      Parigian Had No Duty To AMSC

It is undisputed that Parigian owed no fiduciary duty to AMSC.  The classical theory of

insider trading (wherein a corporate insider owes a fiduciary duty to the corporation and breaches

that duty by trading himself on nonpublic information) does not apply.

2.      McPhail Had No Duty To AMSC

Likewise, it is undisputed that McPhail owed no fiduciary duty to AMSC.

No Misappropriation Theory of Insider Trading

1.      Parigian Had No Duty To The Corporate Executive

It is undisputed that Parigian had no fiduciary or fiduciary-like duty to the corporate

executive who disclosed the information.   Further, the Government does not allege that Parigian

ever received any information from the corporate executive.

2.      Parigian Had No Duty To McPhail

The Government does not allege that Parigian owed a fiduciary or fiduciary-like duty to McPhail.


3.      McPhail Had No Duty To The Corporate Executive

The crux of the Government's argument is that McPhail owed a fiduciary or fiduciary-like duty to the corporate executive who had passed on the inside information.  The argument fails for several reasons.

The "misappropriation theory" of insider trading arose to address the legal quandary of what to do when an insider passes on inside information to an outsider who then trades.  Because the outsider has no fiduciary duty to the corporation he breaches no duty to the corporation and the classical theory of securities fraud does not apply.  Thus, the misappropriation theory of insider trading was born.  Liability exists where the outsider 'misappropriates' the nonpublic information by breaching a fiduciary or fiduciary-like duty to the corporate insider who disclosed the information.

The misappropriation theory premises civil and criminal liability on an outsider's fiduciary or fiduciary-like relationship with the insider who disclosed the information.  United States v. O'Hagan, 521 U.S. 642, 652 (1997).

The 'duty' issue in misappropriation cases turns on whether the outsider, the "misappropriator", obtained the nonpublic information by exploiting the insider-source's expectation that information would be kept in confidence.  The Government bases its claims in this case on the theory that McPhail either (1) owed a fiduciary-like duty of confidentiality to the

AMSC executive under existing case law, or (2) owed a duty of confidence under SEC Rule 10b-5(2)(b)(2).

McPhail did not for several reasons.  First, McPhail and the AMSC executive did not share a fiduciary-like relationship.  Second, the executive did not ask, and McPhail did not agree, that the information would be kept confidential.  Third, the SEC's attempt to bridge the gap in the law by adopting Rule 10b5-2(b)(2) does not, indeed cannot, create a new class of crime.  These points are discussed in detail below.

<u>There Was No Fiduciary-Like Relationship</u>

Obviously, expectation of confidentiality exists in relationships which are "inherently fiduciary" (e.g. attorney-client, doctor-patient, employer-employee).  <u>U.S. v. Chestman</u>, 947 F.2d 551, 568 (2nd Cir. 1991).   The expectation of confidentiality also exists in fiduciary-like relationships.

Friendship in itself does not create a fiduciary or fiduciary-like relationship.  Even business relationships do not per se create a fiduciary relationship.   In <u>U.S. v. Kim</u>, 184 F. Supp 2d 1006 (N.D. Cal 2002), a group of CEO's promised to keep each other's information confidential and had a written formal agreement to do so.  One club member disclosed confidential information to another club member.  That club member told Kim, also a club member bound by the agreement, who traded on the information.  The District Court held that the trading was not unlawful because Kim did not owe a fiduciary duty to the club members.  The District Court reasoned that the confidentiality agreement may have created an ethical duty,

but it did not create a legal one.  Thus, even a formal written confidentiality agreement is not always enough to create a duty.  In our case, we have no agreement whatsoever.

Here, the AMSC executive communicated the information to McPhail without even asking him to keep it confidential.  The AMSC executive's subsequent claim of an expectation of confidentiality does not create an obligation, let alone a fiduciary or fiduciary-like obligation.  Even a genuine one-sided expectation on the part of the person giving away the information does not create a legally actionable claim, and certainly is not enough to impose severe criminal sanctions on the person receiving the information or those further down the line.    There has to be a fiduciary-like obligation.

Important too is the fact that the AMSC executive's 'belief' that McPhail would keep the information confidential is highly suspect.  The AMSC executive was not himself keeping the information close – he was telling others besides McPhail.

The Corporate Executive Did Not Expect The Information To Be Kept Confidential

It is duplicitous for the AMSC executive to allege that he believed McPhail would keep the information confidential when he himself was not keeping the information confidential.  The AMSC executive disclosed the information to family members who traded (his in-laws), at least one other person (David Cancian), and upon information and belief, more.  See SEC v. David Cancian, 1:14-cv-11007-LTS.

The Government fails to bring to the attention of this Court that the corporate insider was leaking information to potentially many outsiders.  This is significant because it shows that the

corporate insider could have no reasonable expectation that the information would be kept confidential when he himself was not keeping it confidential.

SEC Rule 10b5-2(b)(2) Does Not Create A New Class Of Crime

The Government relies on SEC Rule 10b5-2(b)(2) to criminalize the actions of McPhail and by extension, Parigian.  Rule 10b5-2(b)(2) was adopted by the SEC in 2000 in order to define categories of non-business relationships that the SEC considers as meeting the fiduciary-like relationship necessary for liability.   The SEC's administrative position, however, is at odds with case law.   "...neither the First Circuit nor the Supreme Court has defined in detail what constitutes the requisite relationship for misappropriation theory of insider trading."  SEC v. Northern, 598 F. Supp. 2d 167, 175 (D. Mass. 2009).

The Rule sets forth categories of relationships that the SEC believes should give rise to insider trading liability.  The category at issue provides, "Whenever the person communicating the material nonpublic information and the person to whom it is communicated have a history, pattern, or practice of sharing confidences, such that the recipient of the information knows or reasonably should know that the person communicating the material nonpublic information expects that the recipient will maintain its confidentiality."

Never has the Supreme Court imposed liability on the basis of anything less than a ***duty*** (fiduciary or fiduciary-like).  The SEC cannot expand insider trading liability and single-handedly create a new class of crime.  "A court owes no deference to the prosecution's interpretation of criminal law.  Criminal statutes are for the courts, not for the Government, to construe."  Abramski v. United States, 573 U.S. ___, ___ (2014) (slip op. at 21).

13

The Government may rely on <u>United States v. McGee</u>, 763 F.3d 304 (3rd Cir. 8-14-2014) which recently upheld the validity of Rule 10b5-2(b)(2). McGee, however, ignores United States Supreme Court precedent that requires a fiduciary or fiduciary-like relationship for liability. Rule 10b5-2(b)(2) far exceeds the scope of insider trading as established by the Supreme Court. Accordingly, McGee has petitioned the United States Supreme Court for certiorari. No. 14-541. The Government's response was filed on January 14, 2015. United States Supreme Court Docket No. 14-541. It seems likely that the United States Supreme Court will accept the case for review as it recently expressed interest in reviewing this very issue (when denying a Petition for Cert in a different case that had not adequately raised the issue). "I doubt the Government's pretensions to deference. They collide with the norm that legislatures, not executive officers, define crimes" and "[W]hen a petition properly presenting the question comes before us, I will be receptive to granting it." <u>Whitman v. United States</u>, 14-29 (11-10-2014).

<u>No Personal Benefit To The Corporate Insider From The Disclosure</u>

A tippee has no duty to refrain from acting on inside information unless the insider breached his fiduciary duty to the corporation by receiving a personal benefit from the disclosure. For a tippee to be liable, the insider personally must benefit from his disclosure. <u>Newman</u>, supra; <u>Dirks v. SEC</u>, 681 F.2d 824 (D.C. Cir. 1982). Absent some personal gain, there has been no breach of duty by the insider. And absent a breach by the insider, there is no breach by an outsider. <u>Dirks</u> at 662. Here, the corporate executive received no personal benefit from the disclosure to McPhail. The Government does not even allege a personal benefit. Absent some personal benefit to the corporate executive, there is no breach.

Other District Courts have absolved tippees where the insider did not receive a personal benefit from disclosing the information even where it was clear that the outsider traded on the material and nonpublic information.  In SEC v. Maxwell, 341 F. Supp 2d 941 (S.D. Ohio 2004) a corporate insider told his barber material nonpublic information and the barber 'misappropriated' the information by trading on it.  Both the executive and the barber were cleared because the corporate insider received no personal benefit from the disclosure.  Parigian is even farther removed from the insider than was the barber.  Also instructive is SEC v. Anton, No. 06-2274, 209 WL 1109324 (E.D. Pa. April 23, 2009).  In Anton, a board member disclosed material nonpublic information to a professional acquaintance who then traded on the information.  The Court found no securities fraud because the corporate insider received no personal benefit.  See also US v. Rajaratnam, 802 F. Supp. 2d 491, 498-99 (S.D.N.Y. 2011) (unless tippee knows that tipper satisfied the elements of tipper liability by receiving a personal benefit, tippee is not a knowing participant in tipper's breach) and  State Teachers Ret. Bd. V. Fluor Corp., 592 F. Supp. 592, 594 (S.D.N.Y. 1984) ("If the only way [for a tippee] to know whether the tipper is violating the law is to know whether the tipper is anticipating something in return for the unauthorized disclosure, then the tippee must have knowledge that such self-dealing occurred, for, without such a knowledge requirement, the tippee does not know if there has been an 'improper' disclosure of the information.")   "The test for determining whether the corporate insider has breached his fiduciary duty is whether the insider personally will benefit, directly or indirectly, from his disclosure.  Absent some personal gain, there has been no breach of duty."  Newman, p.11.

The Government does not allege that the AMSC executive received a personal benefit from his dissemination of the information.  Indeed, the Superceding Indictment has removed any

reference to the AMSC breaching his fiduciary duty (because he did not receive a personal benefit from the disclosure).   The Government is proceeding under the assumption that a misappropriation theory case does not require a personal benefit to the insider who disclosed the information.  That is flat wrong.

"The elements of tipping liability are the same, regardless of whether the tipper's duty arises under the 'classical' or 'misappropriation' theory."  Newman.  District courts are already following the ruling in Newman.  On January 22, 2015 Judge Carter of the United States District Court for the Southern District of New York issued an Order dismissing criminal charges against four defendants in a misappropriation case on the basis that (1) there was no personal benefit to the insider and (2) no knowledge of any benefit by the tippee [the Newman requirements].   See *Order* 12-cr-887-ALC (attached).  The Court specifically rejected the Government's argument that those two elements are not necessary in misappropriation cases; the very same argument the Government urges on this Court.  Both the Second Circuit and at least one District Court have rejected that argument, as should this Court.

Even if the Government now alleges that the AMSC received a personal benefit (despite its January 21, 2015 Superseding Indictment that eliminates all references to the violation of a fiduciary duty by the AMSC executive) the argument rings hollow.  The only 'benefit' ever even suggested was the AMSC executive's 'furtherance of his friendship' with McPhail.  That form of 'benefit' has been deemed insufficient to meet the "personal benefit" requirement.  The personal benefit element requires proof of a meaningful benefit.  "This standard, although permissive, does not suggest that the Government may prove the receipt of a personal benefit by the mere fact of friendship, particularly of a casual or social nature."  Newman, p. 21.  "[w]e hold that such an inference is impossible in the absence of proof of a meaningfully close personal

relationship that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature." Newman, p. 22. Quoting United States v. Jiau, 734 F.3d 147 (2nd Cir. 2013), the Newman Court said this element requires evidence of "a relationship between the insider and the recipient that suggests a quid pro quo from the latter, or an intention to benefit the latter." Newman, p. 22.

Parigian Did Not Know Of Any Personal Benefit To The Corporate Insider

Besides the element of a personal benefit to the insider, the law also requires that a tippee have knowledge that the insider received a personal benefit from the disclosure. This requirement is particularly important in cases of remote tippees, like Parigian. A remote tippee, by definition, does not receive the information directly from the insider. Thus, a remote tippee will not know whether he is subject to a duty to refrain from trading *unless he actually knows* that the insider received a personal benefit. If a tippee lacks such knowledge, then the tippee cannot have acted willfully (since he would not know that it was unlawful.)

Leaks of nonpublic information may pass through one or more "generations" of tippees before landing in the hands of an unsuspecting trader. The law does not put the burden on a remote tippee to establish that the information they traded on did not derive at some point earlier in time from an improper disclosure for personal benefit. Such a requirement would cast too wide a net. It would put people at risk for facts they do not know: an investor would have to decide either to abstain from all trading on nonpublic information (contrary to the Supreme Court holding that not all such trading is not unlawful), or take the very real risk of unknowingly committing insider trading.

"[w]e find no support for the Government's contention that knowledge of a breach of the duty of confidentiality without knowledge of the personal benefit is sufficient to impose criminal liability." Newman, supra, 16-17.

This Court cannot ignore the fundamental mens rea requirement that a defendant must know the facts that render his conduct illegal. And the only fact that would render Parigian's conduct illegal is if he knew that the AMSC executive had received a personal benefit from disclosing the information to McPhail. The Government would argue that no reasonable person would have thought it was legal to trade on the basis of material nonpublic information originating from a corporate insider in violation of a duty to keep the information confidential. That is not so. A reasonable person would not know whether the insider violated his fiduciary duty to the corporation unless he (the reasonable person) knew that the insider had received a personal benefit from the disclosure. Further, unlike drug dealing or money laundering which are inherently wrong, trading on inside information is *entirely lawful* unless the information was disclosed for a personal benefit to the insider.

Whether the Government is required to allege and prove Parigian's knowledge of a personal benefit to the insider is a legal issue, not a factual one. The Government did not allege this in the Indictment.   Dismissal is appropriate.


McPhail Received No Personal Benefit For The Disclosure To Parigian

In order to circumvent the very necessary elements of personal benefit to the corporate insider and Parigian's knowledge of it, the Government tries to collapse the two levels of disclosure (insider to McPhail; McPhail to Parigian) into one (McPhail to Parigian) and argue that McPhail was the "tipper" and that Parigian was the "tippee." The Government theorizes that

McPhail was the "tipper" (rather than a tippee as he was) then it has to prove only that McPhail received a personal benefit from the disclosure to Parigian.  That is not the law.  A personal benefit to the corporate insider is required.   "Accordingly, we conclude that a tippee's knowledge of the insider's breach necessarily ***requires knowledge that the insider disclosed confidential information in exchange for a personal benefit***."  Newman, supra, 16-17 (emphasis added).

In any event, the Government alleges only that Parigian told McPhail that he would take him out for dinner, without allegeing that Parigian ever did.  *Indictment* §22.


The Information Was Already Public At The Time Of The Trades

The given reason why Parigian was indicted while others were not is because Parigian profited on the basis of trades in AMSC in April, 2011.  The value of the stock fell 42% the day after the company made an announcement on April 5, 2011 relative to lower than expected third quarter earnings.  On that date, AMSC announced that its largest customer, Sinovel, refused to pay for prior shipments and refused to accept new shipments.   As a result, AMSC announced that it expected a net loss for the fourth quarter, and that it was reviewing its earlier recognition of $56 million of revenue for sales to Sinovel that had not yet been paid.  The stock's price tumbled some 42%.

It is important to keep in mind that besides whatever information McPhail may or may not have conveyed in early April, the news of AMSC's having overstated income from Sinovel was already public knowledge.  Five months before the April 2011 AMSC announcement, Barron's published an article in December, 2012 titled 'Flagging Winds from China".   Barron's

reported that AMSC was overstating its sales to Sinovel by two times (AMSC reported $140M in sales to Sinovel, but Sinovel only purchased $70M in product).  The article also reported that Sinovel was buying it's electronic control systems from a company other than AMSC.  See the attached article "Flagging Winds from China."  There were many more reports of AMSC's poor health.  Suffice it to say that there was plenty of news in the public domain.

A simple review of the market information shows that the April 2011 information was known to a very very large group of traders.  2,790,600 MORE shares traded on April 5 before the information was officially made public, than in the days before.[1]  That is an increase of 320% over normal trading.

The announcement by AMSC on April 5, 2011 corroborated what had been public knowledge since the December Barron's article: AMSC had seriously overstated its sales to Sinovel.  Indeed, the information was so widely known that a class action lawsuit against AMSC was already prepared and ready to file on the day of the April 5 announcement.  That lawsuit was filed the very next day on April 6, 2011.  See Dave Lenartz v. American Superconductor Corporation, et al., 1:11-cv-10582-WGY.  The class action suit alleged that AMSC had overstated its earnings by prematurely recognizing revenue from Sinovel when the sales had not been paid.  The suit also alleged that AMSC made false and misleading statements by not

---

[1] Daily trades for the period of time immediately preceding April 5, 2011 are as follows:
March 29, 2011     974,000 shares
March 30, 2011     981,000 shares
March 31, 2011     668,600 shares
April 1, 2011        751,300 shares
April 4, 2011        621,000 shares
April 5, 2011      3,411,600 shares

disclosing that Sinovel was not paying for those shipments.  AMSC settled that lawsuit in May

of 2014 for $10 million.  (See attached article "AMSC Settles Lawsuit for $10M").[2]

No Prosecution of Others

None of the other members of the golfing group who engaged in identical conduct as

Parigian were named in the Indictment.   Only the Securities and Exchange Commission

proceeded against them.  The Government has not.  See *Securities and Exchange Commission v.*

*Eric McPhail, Douglas Parigian, John J. Gilmartin, Douglas Clapp, James A. Drohen, John C.*

*Drohen, and Jamie A. Meadows*, Civil Action No. 1:14-cv-12958.

None of the other people who traded the 3,411,600 shares on April 5, 2011 are named in

this Indictment.  Only Parigian was singled out for prosecution while other persons similarly

situated were not prosecuted.  The decision to prosecute Parigian and not others was based on an

arbitrary and capricious classification.  The decision to prosecute Parigian was not based on the

relative culpability of the various traders (others who engaged in the same conduct were not

prosecuted) nor the intent to profit (Parigian invested much *less* than other people who were not

prosecuted).

---

[2] An interesting footnote to the saga is that the reason why Sinovel stopped purchasing from
AMSC in March of 2011 was because it because had stolen the AMSC wind turbine technology
and, therefore, no longer needed the actual AMSC product.   AMSC sued Sinovel in Chinese
courts for copyright infringement.  See attached article "Chinese firm charged with stealing tech
from Mass. Company."  Adding to the intrigue, a former AMSC employee pled guilty in
September 2011 to charges including economic espionage for stealing the technology and source
codes for Sinovel.  See attached article "China Supreme Court Ruling Favors AMSC in Two
Sinovel Suits."

The purported reason for prosecuting Parigian is the amount of profits he made in April 2011.  The April 2011 trades resulted in profits of allegedly more than $250,000.  But the amount of the profit is an arbitrary and capricious classification.  Profit, in a vacuum, is not a good indicator of culpability.   It is more the amount invested that points to intent and culpability.  Those who invest more money on inside information show more culpability than those who invest less.

Parigian invested only *$6,000* in the puts that generated the April profits.  He had no way of knowing how much the stock would go down on April 6 and how much he would make on the small investment. [3]  It was a freak windfall, not an indicator of culpability.

Conclusion

The Government has taken no action against the AMSC corporate insider who was the original source of the information.  The Government has taken no action against members of the AMSC executive's family who traded.  The Government has taken no action against the other members of the golfing group who engaged in the same conduct as Parigian. And the Government has taken no action against any of the traders of the 3,411,600 shares traded on April 5, 2011.  The selective prosecution of Parigian is inherently unfair.

---

[3] Parigian had no way of knowing the stock would fall so dramatically.  The best information he had ever received from McPhail resulted in only a 15% profit.  If the stock had gone down on April by 15 % (rather than the 42% that it did), then his $6,074 investment would have resulted in profits of only $20,000:

Put (23)      Closing Price - 1.65      Sales  80 X 100 X 1.65  = $13,200
Put (22)      Closing Price - .65       Sales  200 X 100 X .65  = $13,000
Put (21)      Closing Price - 0.00      Sales - 0

Additionally, the Government has failed to allege the essential elements of the offense. "In sum, we hold that to sustain an insider trading conviction against a tippee, the Government must prove each of the following elements beyond a reasonable doubt: that (1) the corporate insider was entrusted with a fiduciary duty; (2) the corporate insider breached his fiduciary duty by (a) disclosing confidential information to a tippee (b) in exchange for a personal benefit; (3) the tippee knew of the tipper's breach, that is, he knew the information was confidential and divulged for personal benefit; and (4) the tippee still used that information to trade in a security or tip another individual for personal benefit." Newman, p. 18.

As is the law, the Government must prove that Parigian knew that the AMSC executive had disclosed the information to McPhail in exchange for a personal benefit. The Government has not even alleged so. Counts I and II must be dismissed.

Dated:  January 26, 2015

Respectfully submitted,
Douglas Parigian
By his attorneys,
Allison J. Koury
Stanley W. Norkunas


_____/s/__Allison J. Koury_____
Allison Koury, Esq.
BBO No.  553132
297  Boston Post Road - #301
Wayland, MA  01778
Tel:  508.358.0030


CERTIFICATE OF SERVICE

I hereby certify that on this day I filed the foregoing Motion to Dismiss using the CM/ECF system, and I understand that the CM/ECF system will send electronic notification to counsel for all parties in this case.

_____/s/__Allison Koury_____

January 26, 2015                                     Allison J. Koury

Dow Jones Reprints: This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit www.djreprints.com

· See a sample reprint in PDF format. · Order a reprint of this article now

FEATURE

# Flagging Winds From China

*American Superconductor's recent rapid growth from wind turbines relies heavily on a single Chinese customer, whose inventories seem to be rising.*

By BILL ALPERT
Updated Dec. 11, 2010 12:01 a.m. ET

Greg Yurek kept American Superconductor aloft through two decades as a public company, searching for a profitable market for its high-power wire. The company rode the dot-com surge to a $75 share price, then back down to $3.50 as it amassed $400 million in losses and one of the Nasdaq's highest short interests.

Four years ago, the superconductor specialists bought an Austrian firm called Windtec that designs wind-turbine generators. Now, sales are growing at a 70% annual clip, to an expected $450 million for the fiscal year ending March 2011. AMSC supplies China's leading wind-turbine maker in that nation's construction of a great wall of wind power. The stock now trades at $33.48 (ticker: AMSC), valuing the Devens, Mass.-based business at $1.5 billion—equal to some 50 times trailing 12 months' earnings and 23 times cash flow.

Yurek's persistence has been rewarded. "It's growth, growth, growth," says the chief executive, who co-founded AMSC in 1987. "Our revenues are going to continue to grow, going forward. I don't see any slowdown."



American Superconductor's revenues are rising at a 70% clip, mostly due to the success of its Austrian wind-power acquisition, Windtec. *Rolf Sjogren/Getty Images*

But the optimism in Yurek's outlook, and in AMSC's high valuation, may be giving insufficient weight to signs that China's boom in wind power is slowing. Wind farms stand idle because the power grid doesn't yet reach them. An industry of well-capitalized wind-turbine makers has arisen with the collective capacity to more than satisfy their nation's needs; in consequence, prices are dropping while receivables and inventories pile up on manufacturers' balance sheets. These worrisome trends are all visible in an initial offering prospectus just filed on the Shanghai exchange by Sinovel Wind Group, the turbine maker that has accounted for almost 80% of AMSC revenues.

### More, More, More

AMSC's big client, Sinovel, has been producing more turbines than it sells, causing inventories to rise. Small turbines dominate sales.



As shown on the left side of the nearby graph, Sinovel's production has steadily outstripped its sales. Sooner or later, Sinovel will have to rationalize its levels of production and inventory—and in turn, its voracious purchases from AMSC. That risk isn't priced into AMSC shares.

Wind power contributed 97% of the $367 million in revenue that AMSC reported for the 12 months ended September, with earnings of $29 million, or 64 cents a share. AMSC bought Windtec in early 2007 for an initial $12 million in stock and an earn-out that lifted the total cost to $51 million. AMSC Windtec licenses "build your own wind turbine" designs to manufacturers. When those customers start up their factories, they purchase the electronic control systems for each wind turbine from AMSC.

Customers who have licensed Windtec's designs include Korea's Hyundai Heavy Industries and India's Ghodawat Energy. But it is Sinovel that put AMSC into the black.



Amer Superconductor
(AMSC - Nasdaq)
Weekly close on Dec. 9

2008    2009    2010
Source: Thomson Reuters

China has big plans for clean energy. This month its government will present its 12th five-year-plan, which aims for 180 gigawatts (billions of watts) of wind installations by 2020. Domestic production has grown so fast in just five years that the country has already blown past the 30-gigawatt goal for 2020 that was set back in 2007. China installed more wind turbines last year than the U.S. State banks and utilities have nourished producers like China Ming Yang Wing Power Group (MY), which recently debuted on the New York Stock Exchange, Dongfang Turbine, and Goldwind (002202.Shanghai or 2208.HongKong). The largest, with a 25% domestic share, is AMSC's partner Sinovel.

On Friday, Sinovel got state approval for its $525 million initial public offer. It also has a $6.5 billion commitment from a Chinese bank. According to the prospectus, sales grew about 70% in the first half of 2010 and new contract awards have built its backlog to 10 gigawatts worth of turbines.

**The Bottom Line**

AMSC's pricey shares look overvalued because of its reliance on a Chinese wind-turbine maker, whose production outpaces sales.

But as fast as Sinovel has grown, the prospectus shows that its production has outpaced shipments by about a third. Consequently, as the right side of the graph shows, average inventories piled up in the six months ended June to more than 270 days' cost of materials. The Chinese prospectus reports Sinovel's purchases from AMSC for last few years, and those numbers roughly track the sales to Sinovel reported by AMSC. The only exception is the first half of calendar year 2010, when Sinovel shows some $70 million worth of purchases. AMSC reported selling about twice that amount. The prospectus also shows that Sinovel has been buying electronic-control systems from another company.

"We don't see any issues there," says AMSC's Yurek. His electronics will be in the bigger turbines that Sinovel is planning for China's offshore wind farms. Within five years, Sinovel aims to be the world's leading turbine maker.

Now that Sinovel plans to go public, AMSC investors can see if that growth matches AMSC's towering valuation.

E-mail: editors@barrons.com

Copyright 2014 Dow Jones & Company, Inc. All Rights Reserved
This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit
www.djreprints.com

ADVERTISEMENT

http://www.wbjournal.com

# AMSC settles lawsuit for $10M

BY

1/21/2014



AMSC has agreed to set aside $10 million to settle claims that it artificially inflated its financial results between July 2010 and July 2011, according to court filings.

A class action lawsuit filed in August 2011 alleged that the premature recognition of revenue on shipments to China-based wind turbine manufacturer Sinovel and other customers artificially raised the Devens-based wind and power grid company's stock price prior to a secondary stock offering.

AMSC – formerly American Superconductor -- has agreed to pay $8.2 million in cash as well as $1.8 million in stock settlement to shareholders during the period of alleged wrongdoing. AMSC spokeswoman Kerry Farrell said the $8.2 million will be funded through the company's insurance plan.

Stockholders will receive some 12 cents per share of AMSC stock if all eligible stockholders submit claims.

AMSC continues to deny it did anything wrong, according to settlement papers.

"The settlement allows both sides to avoid the risks and cost of lengthy and uncertain litigation and the uncertainty of a trial and appeals, and permits (shareholders) to be compensated without further delay," according to a December settlement notice.

Stockholders are required to submit a proof of claim by March 26 to share in the distribution of the settlement fund.

*Updated at 2:10 p.m. with comments from an AMSC spokeswoman.*

© 2014 WBJournal.com

# Chinese firm charged with stealing tech from Mass. company

**By Erin Ailworth** | GLOBE STAFF JUNE 27, 2013

A federal grand jury, acting in a case that could have implications for US-China relations, indicted a Chinese wind turbine maker Thursday on charges that it stole key technology from a Massachusetts company.

The criminal <u>charges</u> escalate a two-year battle playing out in Chinese courts between American Superconductor Corp., which does business as AMSC, and Sinovel Wind Group Co. of Beijing, one of the largest wind turbine makers in the world. It may also add fuel to one of the biggest sources of tension between the United States and China: the theft of intellectual property from US companies.

CONTINUE READING BELOW ▼

"The allegations in this indictment describe a well-planned attack on an American business by international defendants – nothing short of attempted corporate homicide," said John W. Vaudreuil, US attorney for the Western District of Wisconsin, who sought the indictment.

AMSC makes software that controls the operation of wind turbines, and Sinovel was once its biggest customer, accounting for nearly 80 percent of its revenues. In March 2011, Sinovel suddenly stopped accepting shipments from AMSC, canceling contracts

Case 1:14-cr-10201-DJC   Document 41   Filed 01/26/15   Page 28 of 35

and devastating the Devens company, which has since cut nearly 60 percent of its global workforce.

Three months later, AMSC believes it discovered why: It found a replica of its software operating in a Sinovel turbine in China. The company later sued Sinovel for more than $1.2 billion in Chinese courts.

The US criminal case, ironically, stems from Sinovel's sale of four turbines to Massachusetts customers — each turbine operating with the allegedly stolen software, according to the indictment. State records show that at least one of the turbines, at the Massachusetts Water Resources Authority's DeLauri Sewer Pump Station in Charlestown, was purchased using $4.7 million in stimulus funds.

Following the indictment Thursday, AMSC called on the Obama administration and Congress to "re-evaluate the US trade relationship with China," given that companies in China are "brazenly stealing trade secrets."

"This clearly demonstrates that the rights of foreign businesses in China are not currently protected," AMSC chief executive Daniel P. McGahn said in a statement.

Sinovel could not be reached for comment Thursday, but the company has previously denied wrongdoing. Sinovel has countersued AMSC in China, seeking $200 million for breach of contract and other claims. Sinovel is being investigated by the China Securities Regulatory Commission over possible violations of security laws and regulations, according to news reports out of China.

The federal indictment, filed in Wisconsin, where AMSC develops its wind turbine control software, charges Sinovel with conspiracy to commit trade secret theft, criminal copyright infringement, and wire fraud. By stealing AMSC's technology, the indictment charged, Sinovel cheated the Devens company of more than $800 million.

The indictment alleges that several months after AMSC sued Sinovel, the Chinese company sold turbines to customers in Charlestown, Fairhaven, and Scituate that contained the stolen software. One of the turbines, near the wastewater treatment

plant on the Driftway in Scituate, was partially financed by a state bond, according to public records.

If convicted, Sinovel faces a maximum penalty on each count of five years of probation and a fine – on each count — of up to double the more than $800 million the indictment alleges AMSC lost.

"The ongoing cases in China serve as a test for whether American corporations can depend on Chinese courts to address corporate espionage of intellectual property adequately," said Mark Wu, an assistant professor at Harvard Law School.

The US Department of Justice has made a concerted effort to crack down on intellectual property theft in recent years, creating a strategic plan and a task force in 2010 aimed at addressing intellectual property crimes here and abroad.

Last year, the government brought charges against a company controlled by the Chinese government for attempting to steal trade secrets for a valuable white pigment used in paper, plastics, and paint from E.I. du Pont de Nemours & Co., of Wilmington, Del.

In China, AMSC has filed four cases against Sinovel, all which are winding their way through the Chinese legal system and could take from months to years to resolve.

AMSC's situation has gained the attention of top-level officials in Europe, China, and the United States, including Vice President Joe Biden and Secretary of State John Kerry.

"We believe our topic is on the agendas of President Barack Obama, as well as Chinese President Xi Jinping," McGahn, the AMSC chief executive, said during a recent call with analysts.

AMSC has been embroiled in the case since 2011, when one of its field crews in China came across the allegedly stolen technology. An investigation launched by the company led to the 2011 conviction of an AMSC engineer in Austria, who was

sentenced to a year in jail after pleading guilty to transferring software source code to Sinovel to help the Chinese replicate AMSC's technology.

Thursday's indictment offered additional details about how that convicted AMSC engineer, Dejan Karabasevic, allegedly worked with two Sinovel employees to copy the Devens company's technology. According to the court filing, Sinovel offered Karabasevic a six-year, $1.7 million contract and gave him an apartment in Beijing, as well as equipment, including a laptop, to transfer code and modify AMSC's technology.

In several instant messaging chats, according to the indictment, Karabasevic allegedly told the Sinovel employees he had transferred "full code" to the company, and if they succeeded in adapting the technology Sinovel could "separate from AMSC." When Sinovel did break, AMSC's stock and revenues plunged. Layoffs have cut the company's workforce to 362 employees from 842, according to company financial filings.

McGahn has said he remains confident the company will survive the legal battle with Sinovel and prosper.

Revenue increased 14 percent in fiscal 2012, to $87.4 million from $76.5 million in fiscal 2011. Losses were cut in half to $66.1 million. McGahn told analysts in mid-June that the company expects to be profitable by the end of its fiscal 2014.

*Erin Ailworth can be reached at eailworth@globe.com. Follow her on Twitter @ailworth.*

SHOW 6 COMMENTS

© 2014 BOSTON GLOBE MEDIA PARTNERS, LLC

# Bloomberg

# China Supreme Court Ruling Favors AMSC in Two Sinovel Suits

American Superconductor Corp. (AMSC) said two copyright-infringement cases brought in China will be heard in court after the country's Supreme People's Court rejected efforts to move the disputes to arbitration.

The cases are among four suits AMSC filed in 2011 against Sinovel Wind Group Co. (601558), the Chinese wind-turbine maker that was once its largest customer, the Devens, Massachusetts-based supplier of wind-power components said in a statement today. AMSC shares surged the most in 18 months.

AMSC is seeking a total of more than $1.2 billion in damages in Chinese courts, alleging that Sinovel violated sales contracts and stole its technology. Sinovel accounted for 70 percent of the company's sales in 2009 and stopped accepting AMSC shipments in March 2011.

"The ruling by the Supreme People's Court marks an important milestone for our cases against Sinovel's theft of AMSC's intellectual property," Chief Executive Officer Daniel McGahn said in an e-mailed statement. Sinovel had sought to move the two cases to arbitration and the ruling today sent them both back to lower courts.

A former AMSC employee in Austria was sentenced to a year in jail after pleading guilty in September 2011 to criminal charges including economic espionage for obtaining software and source code for Sinovel. U.S. prosecutors charged Beijing-based Sinovel, two of its executives and the employee in U.S. courts in June with stealing trade secrets.

"I look at this as positive, but you've got to keep it in perspective," Carter Driscoll, an analyst at Ascendiant Capital Markets LLC in Irvine, California, said in an interview today. "There's no guarantee of any positive outcome. It could be a number of months before it even hits the docket. As strong as the evidence appears to be in favor of AMSC, there's no dollars changing hands, and this doesn't change the fundamental position of a very challenging wind market globally."

AMSC jumped 14 percent to $2.07 at the close in New York.

To contact the reporter on this story: Justin Doom in New York at jdoom1@bloomberg.net

To contact the editor responsible for this story: Reed Landberg at landberg@bloomberg.net

©2014 BLOOMBERG L.P. ALL RIGHTS RESERVED.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

UNITED STATES OF AMERICA,

                -v-

THOMAS CONRADT, et al.,

                Defendants.

------------------------------------------------------------x

1/22/2015

**12 Cr. 887 (ALC)**

**ORDER**

ANDREW L. CARTER, JR., United States District Judge:

Under Rule 11(b)(3) of the Federal Rules of Criminal Procedure, a district court judge

has an obligation up through the entry of judgment to vacate a previously-accepted guilty plea

and enter a plea of not guilty on behalf of a defendant if it becomes clear that there no longer is a

sufficient factual basis for the plea. *See, e.g.*, *United States v. Culbertson*, 670 F.3d 183, 191 n. 4

(2d Cir. 2012) (citing *United States v. Smith*, 160 F.3d 117, 121 (2d Cir. 1998)). The Second

Circuit has said that, in determining whether such a factual basis exists, judges should "match[]

the facts in the record with the legal elements of the crime." *United States v. Calderon*, 243 F.3d

587, 589-90 (2001) (alteration in original) (citing *United States v. Smith*, 160 F.3d 117, 121 (2d

Cir. 1998)). Facts considered to be in the record can include not only the defendant's allocution,

but also any representations made by counsel for the defense and the government on the record

and the allegations in the indictment. *Smith*, 160 F.3d at 121.

In this case, after reviewing the Second Circuit's decision in *United States v. Newman*,

Nos. 13–1837–cr (L), 13–1917–cr (con), 2014 WL 6911278 (Dec. 10, 2014), as well as all the

facts in the record with respect to the guilty pleas of Defendants Thomas Conradt, David

Weishaus, Trent Martin and Daryl Payton, this Court advised the parties on December 18, 2014

that it was inclined to vacate their guilty pleas. Specifically, the Court was skeptical that the

pleas were sufficient in light of *Newman*'s clarification of the personal benefit and tippee knowledge requirements of tipping liability for insider trading.  *See* 2014 WL 6911278, at \*9-\*13.  The Court reserved decision, however, in light of the Government's request for an opportunity to submit briefing in support of their position that *Newman*'s analysis does not apply in insider-trading cases prosecuted under a misappropriation theory.  After having reviewed that submission, as well the Defendants' submissions in response, the Court hereby **VACATES** each of the aforementioned guilty pleas and enters pleas of **NOT GUILTY** on behalf of those Defendants.

Specifically, this Court finds that, as indicated in *Newman*, the controlling rule of law in the Second Circuit is that "the elements of tipping liability are the same, regardless of whether the tipper's duty arises under the 'classical' or the 'misappropriation' theory."  2014 WL 6911278, at \*4 (citing *SEC v. Obus*, 693 F.3d 276, 285-86 (2d Cir. 2012)); *see also Obus*, 693 F.3d at 285-86 ("The Supreme Court's tipping liability doctrine was developed in a classical case, but the same analysis governs in a misappropriation case.") (citation omitted). Additionally, even if *Newman* did not specifically resolve the issue, the Court is swayed by the fact that *Newman*'s unequivocal statement on the point is part of a meticulous and conscientious effort by the Second Circuit to clarify the state of insider-trading law in this Circuit. Accordingly, even assuming *arguendo* that the Government is correct that the cited language in *Newman* is dicta, it is not just any dicta, but emphatic dicta which must be given the utmost consideration.  *See Jimenez v. Walker*, 453 F.3d 130, 142 (2d Cir. 2006) ("Dicta deserve close

2

consideration; emphatic dicta, all the more.").[1]  Finally, the Court notes that it agrees with

*Newman*'s articulation of the requirements of tipping liability and its statement that such analysis

applies equally in misappropriation cases.  *Accord SEC v. Yun*, 327 F.3d 1263, 1274-80 (11th

Cir. 2003).

    At the January 23, 2015 status conference, the Court will address Defendants Benjamin

Durant and Daryl Payton's Motion to Dismiss the Indictment (ECF Nos. 148, 160, at 6 n.4), as

well as the Government's request that, under *United States v. Mennuti*, 639 F.2d 107 (2d Cir.

1981), and its progeny, this Court evaluate the sufficiency of the Government's intended proof at

trial.  The Court excuses each one of the Defendants from personally appearing at the

conference, and the Clerk of Court is respectfully directed to terminate ECF numbers 162, 164

and 165.

**SO ORDERED.**

**Dated:**  January 22, 2015

      **New York, New York**

                    **ANDREW L. CARTER, JR.**
                    **United States District Judge**

---

[1]    The Government's related argument that prior Second Circuit decisions have held that a personal benefit to the tipper is not required in misappropriation cases is similarly unavailing.  *Newman* construes each one of the authorities the Government cites in this regard to be consonant with its holding.  *See, e.g.*, *Newman*, 2014 WL 6911278, at *4, *6-*7.  Moreover, the relevant language from *United States v. Libera*, 989 F.2d 596 (2d Cir. 1993), on which the Government relies most heavily in support of this proposition, has itself been construed to be mere implication in dicta.  *SEC v. Sargent*, 229 F.3d 68, 77 (1st Cir. 2000) (observing of *Libera*: "[t]he Second Circuit strongly implied, also in dicta, that there was no need to make an affirmative showing of benefit in cases of misappropriation").