UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————
)
UNITED STATES OF AMERICA,   )
)
vs.   )   Docket No. 14-cr-10201-DJC
)
ERIC McPHAIL,   )
Defendant.   )
———————————————————   )

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS SUPERSEDING INDICTMENT BASED ON FAILURE TO ALLEGE A CRIME**

ERIC MCPHAIL, a tile and marble salesman, is alleged to have exploited his personal friendship with a senior executive of American Superconductor Corporation ("AMSC"); misappropriated inside information and tipped his co-defendant, Douglas Paragian, who traded in the stock.  Oliver Wendell Holmes Jr. once said, "[t]he character of every act depends upon the circumstances in which it is done."[1]  It is the *circumstances* of McPhail's pre-disclosure relationship with the executive – the insider -- that will bring to light the propriety of his receiving non-public information and/or subsequently dispersing the information.

McPhail and the AMSC executive became friends as members' of the same country club, and frequently played golf and socialized together, both at and away from the club.  The pair had no actual, mutual or expressed agreement between them regarding the confidentiality of matters discussed by them.  Nevertheless, the Indictment[2] alleges that as part of their social relationship, McPhail and the executive shared personal confidences about work and family life.  It is *this* social interaction and sharing from which the alleged duty of trust and confidence regarding

---

[1]  Source:http://www.quotationspage.com/quotes/Oliver_Wendell_Holmes_Jr./

[2]  There was an original Indictment and a Superseding Indictment.  For the purposes of this motion, all references to "Indictment" are to the Superseding Indictment unless specifically identified to distinguish the *original* from the *superseding*.

inside information arose: presumably pursuant to SEC Rule 10b5-2(b)(2).[3]

McPhail is not alleged to have stolen the non-public information by secretly pilfering the information from the insider without his knowledge; instead the allegation is that he was freely given the information and, thus, properly possessed the non-public information when he related it to Paragian in alleged violation of a duty of confidentiality he owed the AMSC executive.

McPhail, who did not trade himself, and had no relationship of any kind with AMSC, is a classic "outsider" in the insider trading paradigm.  As an "outsider," McPhail's criminal participation in the conspiracy and security fraud counts is foundered on the so-called, "misappropriation theory" of insider trading; as compared to the "classic theory".  See and compare, *United States v. O'Hagan,* 521 U.S. 642 (1997) (misappropriation theory) and *In Re Cady, Roberts & Co.*, 40 S.E.C. 907, 912 (1961), cited with approval in *Dirks v. SEC*, 463 U.S. 646, 653 (1983) (classic theory).

McPhail submits herein that the Indictment is fatally flawed and fails to set forth the necessary elements for insider trading under either the classic or misappropriation theories.  The Indictment lacks any allegation or factual basis to support the existence of an actual, mutual, fiduciary-*like* agreement between McPhail and the insider to keep the subject matters discussed between them confidential.  SEC Rule 10b5-2(b)(2), on which the government is anticipated to rely to create a fiduciary-*like* duty, is legally and factual inapposite, and insufficient, in and of

---

[3]  On its website, the SEC announced that it had adopted new Rule 10b5-2 to resolve insider trading issues where the courts have disagreed. "Rule 10b5-2 clarifies how the misappropriation theory applies to certain non-business relationships. This rule provides that a person receiving confidential information under circumstances specified in the rule would owe *a duty of trust or confidence* and thus could be liable under the misappropriation theory. http://www.sec.gov/answers/insider.htm (last accessed February 11, 2015)

§ 240.10b5-2 Duties of trust or confidence in *misappropriation* insider trading cases.
(b) Enumerated "duties of trust or confidence." For purposes of this section, a "duty of trust or confidence" exists in the following circumstances, among others: … (2) Whenever the person communicating the material nonpublic information and the person to whom it is communicated have a history, pattern, or practice of sharing confidences, such that the recipient of the information knows or reasonably should know that the person communicating the material nonpublic information expects that the recipient will maintain its confidentiality; or …

itself, to act as a substitute for a mutually agreed understanding of trust and confidence and is,

nevertheless, beyond the authority of the SEC to promulgate.  The Indictment also fails to allege

a benefit flowing to the insider in return for the disclosure of the non-public information.[4] See

*United States v. Newman*, No. 13-1837-CR, 2014 WL 6911278, at *1-14 (2d Cir. Dec. 10, 2014).

### FACTUAL ALLEGATIONS IN THE SUPERSEDING INDICTMENT

AMSC is a company that produces superconducting wire and hardware/software for the

wind power industry.  Shares of AMSC are securities, as that term is defined in 15 U.S.C. §

78c(a)(10), registered with the SEC pursuant to § 12(g) of the Securities Exchange Act of 1934,

and publicly traded on the National Association of Securities Dealers Automated Quotations

exchange ("NASDAQ").  NASDAQ is a national securities exchange.  See *Indictment*, ¶5.

The Indictment alleges that between 2004 and 2011, the insider provided confidential

information about the company's quarterly earnings and other matters related to *Sinovel Wind*

*Group Co., Ltd*. ("Sinovel") which might affect the selling price of AMSC's shares.  The

Indictment further alleges, "McPhail used email and other means to disseminate the inside

information to his friends, including [co-defendant] Douglas Parigian and certain others, with the

intent that they profit by buying and selling shares in AMSC, or options on such shares, on the

basis of the inside information"… he "had obtained … from [the insider]". *Indictment*, ¶s 7&8.

The Indictment sets out several factual examples of the alleged misappropriation

paradigm and subsequent transmission of the inside information.  In ¶14, the government alleges

that "on or about July 9, 2009, McPhail emailed Parigian, as well as [others].  The McPhail email

was in response to "an earlier email from Person B recommending a particular penny stock,

McPhail said, in part, "Try this one. . . AMSC ... watch it on July 30th." *Indictment*, ¶14.  The

---

[4]  The issue regarding the need to allege and prove a benefit flowing to the insider was briefed by co-defendant
Parigian and McPhail adopts the arguments made by Mr. Parigian as if fully set forth herein.

next day, Person D emailed McPhail and said: "I appreciate your leads and I was just doing my due diligence and if you looked at that attachment about the stock you sent, you'd see that stock looks like a dog as our good buddy Gordon Gekko would say."  Further writing, Person D stated: "So, I'm supposed to look at this research that clearly says don't buy, and go by my good buddy that says, "trust me" I can't divulge my info? .... Just be ready on August 15th if the stock bombs to take a beating!" [5]  *Indictment*, ¶15.

Expounding on the July 2009 example, the Indictment sets out that AMSC issued a press release on July 16th saying that it would publish first quarter financial results on July 30, 2009, before the market opened [*Indictment* ¶16]; that on July 30, 2009, before market opening, AMSC announced positive earnings for the first quarter; and that "on the news, AMSC stock closed that day at $32.13 per share, up from the prior closing price of $26.28".   See *Indictment*, ¶17.

With these facts as the foundation, the government alleges that on about July 30, 2009, "Person B sent an email to Parigian, McPhail and others, bearing the subject line, 'AMSC,' saying, 'Wow!! When do we get out? Eric, Concord is on me. No need to bring your checkbook.'"  *Indictment*, ¶18.  Soon thereafter, Persons B, C and D sent emails revealing at what price they sold their shares."  *Id.*   Between July 9, 2009, and July 24, 2009, Parigian bought 1200 shares of AMSC stock and after AMSC's earnings announcement on July 30, 2009 sold 1000 shares of AMSC, netting about $9,000."  *Indictment*, ¶19.

The Indictment sets forth several additional examples of the acquisition and subsequent transmission paradigm allegedly used by the defendants in acquiring and using the inside information about quarterly reports and other financial information; September, 2009, October, 2009, July, 2010, and December, 2010. See *Indictment*, ¶s 21-38.  Each of the allegations in the additional examples follow the same general pattern and are allegedly supported by emails

---

[5]  The allegation is that Person D is making the statement that "I can't divulge my info," not McPhail.

between McPhail, Parigian and the un-named individuals B-E.  *Id.*

On September 29, 2009 McPhail wrote Parigian and Person D that he had gone to the baseball game with the executive and been told "that AMSC has a $100 Million deal with China that should be signed very shortly."  *Indictment*, ¶21.  The email further related that "[t]his announcement should spike them close to 10%."  In the same email, McPhail said that the recipients should "circle October 29th for the next big day ... . it could/should be as good as the last one, provided the market cooperates that day."  *Indictment*, ¶21.

Parigian and the others (not McPhail) allegedly traded in the stock based on the information provided by McPhail.  See *Indictment*, ¶s 21-32.

As another example, the Indictment sets out that on July 28, 2010, McPhail emailed Parigian and Persons C and D and told them that he "[j]ust had dinner with my friend ... expect to go up 4-5 tomorrow."  McPhail further said that he was sorry for the delay, "but [I] don't have a dog in the fight so wasn't too concerned on the news."  McPhail also related that "[q]uarterly earnings will beat everything and yearly estimates going up across the board. Hopefully you guys are still in the game- you will make money tomorrow."  See *Indictment*, ¶33.  Parigian and the others traded on the information provided by McPhail.  See *Indictment*, ¶¶ 34-35.

In March and April 2011, the government alleges, McPhail *misappropriated* and transmitted a different kind of financial information from the insider.  The Indictment asserts that *Sinovel*, AMSC's primary customer for wind turbine hardware and related technology, generating approximately 70 percent of AMSC's revenue from 2008 through 2010, was negotiating with AMSC about upgrading the technology in certain products.  There appeared to be a question whether *Sinovel* would accept about $65,000,000 in products, scheduled for delivery by March 31, 2011, if the upgrades were not made.  The negotiations also concerned "when *Sinovel* would

pay down about $62,000,000 in outstanding receivables." *Indictment*, ¶39.

The indictment relates that "[o]n or about Thursday, March 31, 2011, *Sinovel* told AMSC that Sinovel would not accept additional shipments or pay down its overdue accounts receivable balance before the end of the quarter." *Indictment*, ¶40.  On or about March 31, 2011, the executive at AMSC, "was made aware of the breakdown in negotiations with *Sinovel*". *Indictment*, ¶41.

The Indictment alleges that "[o]n or about Thursday, March 31, 2011, and Friday, April 1, 2011, [the executive] confided in McPhail about the problems at AMSC." *Indictment*, ¶42. McPhail is alleged to have "conveyed this material, nonpublic information to Parigian and to Persons F and G" between April 1 and 3, 2011.  See *Indictment*, ¶43.

Parigian and the others either liquidated their existing holdings in AMSC and bought put options on AMSC stock."  See *Indictment*, ¶¶44-50.

After setting forth the several factual examples above, the Indictment alleges that McPhail and Parigian, together with others known and unknown to the Grand Jury, conspired to commit offenses against the United States … in contravention of Rule 10b-5 … and (c) engaging in acts, practices and courses of business which would and did operate as a fraud and deceit, *in connection with the purchase and sale of securities*" in violation of 18 U.S.C. § 371.  *Indictment* ¶53.  In a separate count, [Count Two] based on the same facts, McPhail and Parigian are charged with security fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff(a), 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2.

### THE SUPERSEDING INDICTMENT CHANGED THE *CLASSIC* THEORY TO THE *MISSAPPROPRIATION* THEORY OF INSIDER TRADING

In the original Indictment the phrase that appeared in ¶9a read: [the insider], *in violation of his duty to AMSC and its shareholders*, at various times revealed to McPhail material,

nonpublic information about AMSC's quarterly earnings and other business activities." This phraseology was indicative of a typical prosecution under the Classic theory. This paragraph was changed in the Superseding Indictment, by deleting the phrase *in violation of his duty to AMSC and its shareholders*, which alteration would change the theory of prosecution to a misappropriation theory – the alternative to the Classic theory when no insider is alleged to have breached a fiduciary duty. [6]

In *United States v. O'Hagan,* 521 U.S. 642 (1997) the Supreme Court indicated that the classical theory focuses solely on corporate "insiders"; that is, those within the corporation who personally benefit by secretly trading on inside information they receive from the corporation regarding the corporation's shares. The misappropriation theory, on the other hand, extends the reach of the prohibition against insider trading to those traders who exhibit the same proscribed conduct, but who would not otherwise be liable because they are outsiders.

Rachel Goldstein, in her article *Insider Trading and United States v. O'Hagan: The Supreme Court Reinstates Securities Fraud Convictions Based on the Misappropriation Theory*, 1 Chap. L. Rev. 119, 123-25 (1998) explained that the misappropriation theory is one of two theories created under Section 10(b)'s proscription of deception. Ms. Goldstein further noted that the classical theory "pertains *only* to an insider, including a tippee of the insider, who has a fiduciary or similar relationship to the company shareholders in whose stock the insider traded. *Id*., at 123. (emphasis added). Under the classical theory, an "insider owes a fiduciary duty to the corporation's shareholders not to trade on inside information for his personal benefit." However, because "O'Hagan was neither an insider of the company whose shares were being traded, nor a tippee of any insider" he could not be prosecuted under the classical theory. *Id*., at 124. But, the

---

[6]  The Superseding Indictment also added ¶9e – "As Parigian knew at the time, McPhail expected to receive, and received, a benefit from disclosing the Inside Information to Parigian and others." This allegation in ¶9e was not made in the original Indictment.

Supreme Court determined that O'Hagan was within the reach of the misappropriation theory, which specifically extends the prohibition against insider trading *to trading by outsiders*, such as O'Hagan. See *Securities & Exch. Comm'n v. Cherif*, 933 F.2d 403, 408 (7th Cir. 1991).

With the excision of the insider's breach from ¶9d it is patently clear that the Indictment acknowledges that McPhail received the inside information with the executive's knowledge and authority before re-transmission to Paragian. It is also crystal clear in this case that the Indictment does not allege that McPhail stole – in a larcenous form of taking -- the information from the insider.  Likewise, although the original indictment alleged that the insider breached his duty to the shareholders when he divulged the non-public information to McPhail, it is clear that in the Superseding Indictment McPhail was not a tippee, given the non-public information as a result of a breach of the insider's duty to the company shareholders, from which he would derivatively assume a fiduciary duty to the AMSC shareholders.

The structure of the indictment itself dispels the notion that the government alleges the insider disclosed the inside information fraudulently.  He is not named as a defendant, a conspirator or an aider and abettor.  Paragraph 55 of the Indictment, the charging language of the substantive securities fraud count, states that Eric McPhail and Douglas Parigian, "… (c) engage in acts, practices …, in connection with the purchase and sale of shares and options on shares in American Superconductor Corporation [ ] specifically, by *willfully engaging in a scheme to misappropriate material, nonpublic information* about AMSC's finances and business activities and, while in possession of that information, to profit by buying and selling shares, and options on shares, of AMSC stock." *Indictment*, ¶55.

**FACTS RELATING TO A RELATIONSHIP
OF TRUST AND CONFIDENCE UNDER RULE 10B5-2(b)(2)**

The facts upon which the government claims that a relationship of trust and confidence

8

arose under Rule 10b5-2(b)(2) are not set forth in the original or superseding indictments. Instead, the nature of the existing relationship between McPhail and the executive is laid out in the parallel enforcement action brought by the SEC. See *SEC v. McPhail*, et al., 1:14-cv-12958-RWZ, *Complaint*, ¶s 20-26.  The Enforcement Complaint asserts that "[b]y 2009, McPhail and the AMSC executive had developed a particularly close bond, communicating almost daily and playing golf or otherwise socializing together on a regular basis. *Id*., at ¶20.  Further, the SEC asserts that "[w]hen McPhail, who joined the club after marrying a member, was getting a divorce and in jeopardy of losing his membership, the AMSC executive successfully petitioned the club president to allow McPhail to remain a member."  *Id*., at ¶21.  Also, the SEC sets out that at "[a]nother time, the AMSC executive paid off a $6,000 gambling debt for McPhail." *Id*., at ¶21.  Additionally, the SEC alleges that "[i]n the context of this [extant] relationship, McPhail and the AMSC executive exchanged intimate and confidential details about their personal and professional lives, relying on each other for support and advice."  *Id*., at ¶22.  The types of matters exchanged involved "McPhail confide[ing] in the AMSC executive about his divorce and the terminal illness of a family member." *Id*.  Conversely, the SEC alleges that "the AMSC executive shared with McPhail the stresses of his job as a senior officer at a public company." *Id*., at ¶22.  Thereafter, the SEC submits that "[i]n the context of *this* relationship, from time to time, the AMSC executive and McPhail discussed AMSC's stock price and prospects." *Id*.  There is no indication that the executive was seeking advice from McPhail or counseling of any nature, rather, the SEC says that "[t]hese conversations usually centered on the AMSC executive's desire to cash out his holdings of AMSC stock and options if the share price reached a certain target, in order to fund an early retirement from the company.  *Id*., at ¶23.

As the reason for divulging non-public information to McPhail, the SEC claims that

"[t]he AMSC executive shared confidential information with McPhail because *he believed* McPhail would maintain its secrecy." *Id*., at 25.  As a basis for the executive's belief, the SEC says that "[t]he AMSC executive understood that McPhail did not trade AMSC stock and, given their relationship of trust and confidence, the AMSC executive was *comfortable* talking about his company's prospects with McPhail." *Id*.   Concluding on this allegation the Enforcement Complaint alleges that:

> Based on their history, pattern, and practice of sharing confidences, McPhail knew or reasonably should have known the AMSC executive *expected* McPhail to maintain the confidentiality of the material nonpublic information communicated to him by the AMSC executive.  *SEC v. McPhail*, et al., 1:14-cv-12958-RWZ, *Complaint*, ¶26.

Glaringly missing from the original Indictment, the Superseding Indictment or the SEC Enforcement Complaint, is any allegation or assertion that the executive told McPhail that he would not disclose what McPhail mentioned to him or asked McPhail not to divulge what he [the executive] mentioned to him. Also telling, there is not one allegation that either McPhail or the executive maintained (kept) any of the confidences each shared with the other. Compare *United States v. McGee.*

Sharing confidences is not synonymic for *maintaining* confidences.

## ARGUMENTS

**I.   THE INDICTMENT IS FATALLY FLAWED AS IT FAILS TO ALLEGE THE ELEMENTS FOR INSIDER TRADING UNDER THE SO-CALLED *MISAPPROPRIATION* THEORY.**

The fundamental question McPhail presents herein is whether non-public information spoken about between friends, without an expressed reservation regarding use or further dissemination, can, after being disclosed, be considered encumbered by evidence establishing a unilateral expectation of the information provider.

The alleged misappropriator in the instant case is McPhail.  Harkening back to the logically perceptive remark by Justice Holmes in the first paragraph of this writing, the character of the interaction between McPhail and the executive can only be determined by the circumstances in which it was done.  Whether he stole the non-public information, or simply put himself in a position to receive the information, is solely dependent on McPhail's intention before and at the moment of transmission – not the executive's extant or after-acquired expectation.  For, if, as the Indictment alleges, McPhail always intended to further disseminate the knowledge he acquired from the executive, there could not have been an agreement or understanding to maintain the information in confidence.  See *Indictment*, ¶55 ("Specifically, by willfully engaging in a scheme to misappropriate material, nonpublic information about AMSC's finances and business activities and, while in possession of that information, to profit by buying and selling shares and options on shares, of AMSC stock.").  The grammatical construct of this allegation makes it clear that the scheme is prior in time to the acquisition of the information.  Thus, there could never have been an intention on McPhail's part to maintain the confidence, and the executive's expectation could not change the character of the interaction.

From the changes in the Superseding Indictment it is impossible to determine whether the government now alleges that McPhail properly received the non-public information and, thereafter, distributed the information notwithstanding an *expectation* by the corporate insider that McPhail would hold the information in confidence (embezzlement-*like*). *Indictment* ¶11 ("McPhail knew and reasonably should have known that [the executive] expected that McPhail would keep confidential information he received from [the executive]") or whether McPhail deceptively and intentionally sought to extract the non-public information from the executive. The distinction shades the elements needed to establish a fiduciary-*like* duty required to prove a

violation under the misappropriation theory.

Under the misappropriation theory liability is predicated on the existence of a fiduciary or fiduciary-*like* duty flowing from the outsider to the insider – the source of the information.

McPhail's criminal liability and the sufficiency of the Superseding Indictment are, therefore, inextricably linked to the existence of an agreement between McPhail and the insider that the information which flowed between them would be *maintained* confidentially and not be shared with anyone else – a fiduciary-*like* agreement.  Reason dictates that in the analytical calculus to determine if the "history, pattern, or practice" of the parties creates a duty of confidentiality pursuant to SEC Rule 10b5-2(b)(2), the "history, pattern, or practice," and the intention of the parties of *maintaining* confidences should be far more telling than a history of *sharing* confidences.  There is not a single allegation in the Indictment that the executive maintained McPhail's so-called confidences, or that McPhail never told anyone of the stress of the executive's position at AMSC – the two basic categories of historical reference to imply a present duty.

a.  Elements of the Misappropriation Theory

After the Supreme Court's recognition of the misappropriation theory in *O'Hagan* and the earlier decision by the Second Circuit in *United States v. Chestman,* 947 F.2d 551 (2d Cir. 1991*)* (reversing conviction on Stockbroker's Rule 10b-5 due to absence of a showing of a fiduciary relationship existing between stockbroker's client and client's wife regarding inside information pertaining to client's wife's family business) and *United States v. Reed,* 601 F.Supp. 685, 715 (S.D.N.Y.) (reasoning, that "[t]he mere unilateral investment of confidence by one party in the other ordinarily will not suffice to saddle the parties with the obligations and duties of a confidential relationship"), rev'd on other grounds, 773 F.2d 477 (2d Cir.1985), under which

questions of liability turn on the nature of the details of the relationships between family members, such as their prior history and patterns of sharing confidences, the SEC adopted Rule 10b5-2. "The purpose of the new rule was to provide clarity to the issue of which relationships would create a fiduciary duty to establish insider trading under the misappropriation theory." See Starkey De Soto, *"Well, Now I'm Screwed": The Ever-Expanding Liability for Outsider Trading*, 33 Whittier L. Rev. 275, 284-85 (2012). In a release accompanying its proposed rule, the SEC took a direct shot at the *Chestman* approach, stating: "In our view, however, the *Chestman* majority's approach does not fully recognize the degree to which parties to close family and personal relationships have reasonable and legitimate expectations of confidentiality in their communications. For this reason, we believe the *Chestman* majority view does not sufficiently protect investors and the securities." See 21 Sec. Crimes § 7:26.

Misappropriation is a concept/word encompassing several variations of a criminal taking. One might *misappropriate* an object or intangible information by (1) larceny, (2) embezzlement or (3) by trick or deceit (fraud). For example, misappropriation can denote a classic larceny of information – an insider puts confidential information in his desk draw and a stranger, without authority, opens the draw and takes or reads the confidential document and either trades or tips a friend. The stranger would have stolen the document and/or the information contained thereon. Under this example, there would be no fiduciary-*like* relationship between the owner of the property and the thief. Whatever crime the stranger may have perpetrated, it would not be insider trading.

Or, instead of a stranger, the insider's administrative assistant, without authority, opens the draw and takes or reads the confidential document and either trades or tips a friend. In the administrative assistant scenario the relationship between the assistant and the insider would

have to be examined to determine whether a fiduciary-*like* duty existed between them that would have been breached by the assistant. See and compare, *United States v. Larrabee*, 240 F.3d 18 (1st Cir. 2001). In *Larrabee*, a non-lawyer employee of a law firm surreptitiously entered the office of one of the lawyers working on a bank merger and read, without authority, the details of the merger. Larrabee traded and also further disseminated the information gleaned from the documents he reviewed. The *Larrabee* court said "the misappropriation theory outlaws trading on the basis of nonpublic information by a corporate 'outsider' in breach of a duty owed NOT to a trading party, but to the source of the information. *Id*., citing *O'Hagan* at 652-53, (emphasis added; internal citation omitted). In *Larrabee*, the fiduciary duty flowed to the law firm to not use information from clients without authority.

Alternatively, the word *misappropriation* can connote an embezzlement-like taking when an outsider properly receives and then uses without authority the inside information entrusted to him. Employing the same scenario as above, the stranger might be told to take all the documents out of the insider's desk and store them in boxes. If the stranger retrieved the documents and, before storing them, read the confidential information and relayed it to others, who then traded in the company's stock based on the information in the documents, whether the stranger's actions constituted a misappropriation of the non-public information and an insider trading violation, would depend on whether the stranger was under any fiduciary-*like* duty not to read the material in the course of storing it away and, thereafter relay or trade on the basis of such information. Absent such a duty, there would be no fiduciary-*like* violation. See and compare *Chiarella v. United States*, 445 U.S. 222, 226-27 (1980); *O'Hagan*.

More akin to the situation in the case at bar, instead of a stranger, direct employee of the insider, or an individual who owes the organization to whom the information has necessarily

been disclosed (all as discussed above), the corporate insider tells a friend inside information, who then, without telling the insider, passes the information along to another friend.  Without an expressed request from the insider to maintain the information in confidence, the friend is like the administrative assistant and the employee of the organization (Larrabee) and the friend's liability is dependent on showing a relationship of trust and confidence to maintain the inside information in confidence.

Regarding the last scenario, in *SEC v. Nothern*, 598 F.Supp.2d 167 (D. Mass 2009) the court addressed the issue of to whom a fiduciary duty must flow in order to determine insider trading liability.  In *Nothern*, the court reasoned and held that criminal liability of persons, as McPhail in this case, and Parigian, as the misappropriation "tipee," is derivative from and dependent on the alleged misappropriation by McPhail. *Id*.  Thus, the *Nothern* court ruled, the information would be misappropriated only "[i]f [McPhail] breached a fiduciary duty [flowing to the AMSC executive] … .  Thus, the [government must allege and] prove that [McPhail] had a fiduciary relationship with [AMSC] or a *similar* relationship of trust and confidence [with the AMSC executive]". *Id*. (emphasis added); see also, *Dirks v. SEC*, 463 U.S. 646, 662 (1983) (A tippee's liability is derivative of a tipper's liability; absent a breach of duty by the tipper, there can be no derivative breach by the tippee).

The cornerstone for an insider trading Indictment based on the misappropriation theory is the existence and nature of a fiduciary (or fiduciary-*like*) relationship between the insider and the outsider (tippee), respectively.  In *Chiarella v. United States*, 445 U.S. 222, 226-27 (1980), the Court ruled that there is no general duty to disclose before trading on material nonpublic information, and held that "a duty to disclose under §10(b) does not arise from the mere possession of nonpublic market information." *Id*., at 235.  Such a duty arises rather from the

existence of a fiduciary relationship. See *Id.*, at 227–235.

McPhail, although not alleged to be a classic fiduciary, is, nevertheless, alleged to have owed a duty of trust and confidence to the AMSC executive. *Indictment* ¶ 9a.   The Indictment asserts that the duty of trust and confidence owed to the executive arose from "their relationship" which "involved a history, pattern, and practice of *sharing* confidences and an understanding that information conveyed between them was to remain confidential." *Id*.   The Indictment claims that "McPhail knew and reasonably should have known that [the executive] *expected* [him] to keep confidential information he received from [the executive]". *Id*.   However, there is no corresponding allegation in the Indictment that McPhail agreed to keep the information about the corporation imparted to him confidential.

The law generally does not impose a fiduciary duty without evidence of the fiduciary's initial acceptance of his or her role. This element of choice--a willing acceptance of office or specific obligation--is not essential to the creation of a legal entity such as a trust, but is essential to the imposition of liability for breach of a fiduciary obligation.   See Eileen A. Scallen, *Promises Broken vs. Promises Betrayed: Metaphor, Analogy, and the New Fiduciary Principle*, 1993 U. Ill. L. Rev. 897, 905-08 (1993).   An agreement of confidentiality *expected* (inferred) only by the executive would not be binding on McPhail.   When no expressed agreement is alleged, then, analytically, the question is not whether the underlying relationship of confidentiality can be implied (*expected*), but, who can and must imply the existence of such a relationship?   As between the two parties, the implied existence of an agreement by only one of the parties that a confidentiality duty exists cannot alone create a duty binding the other party. See *SEC v. Conradt*, 947 F. Supp. 2d 406 (S.D. N.Y. 2013) (SEC stated an insider trading claim against equities analyst and a broker-dealer's registered representatives, under the

misappropriation theory of insider trading liability, where it plausibly alleged that analyst had a sufficient history, pattern, or practice of sharing confidences with tipper that they *mutually* expected and understood that information disclosed was not to be tipped or traded upon). See also, *United States v. McGee*, 763 F.3d 304, 311 (3d Cir. 2014).

The existence of a fiduciary relationship focused at the inside information is the critical factor needed to make a charge and sustain a conviction under the misappropriation theory.  See 1 Chapman Law Review 119, *Insider Trading and United States v. O'Hagan: The Supreme Court Reinstates Securities Fraud Convictions Based on the Misappropriation Theory*, Rachel Goldstein.  In *O'Hagan*, the Court reasoned that "[b]ecause the disclose-or-refrain duty is extraordinary, it attaches only when a party has legal obligations other than a mere duty to comply with the general antifraud proscriptions in the federal securities laws." 220 U.S.App.D.C., at 322, 681 F.2d, at 837.  See *Chiarella*, 445 U.S., at 235, n. 20.  In *United States v. O'Hagan*, the Court ruled that "[a] duty [to disclose] arises from the relationship between parties ... and not merely from one's ability to acquire information because of his position in the market," it naturally follows, then, that there must be an act by the initial information recipient to convert otherwise permissible possession of the information [into] an illegal dissemination of that information.  See *O'Hagan* at 657-658.

Not all trading by an outsider based on inside information is improper.  In *SEC v. Switzer*, 590 F. Supp. 756, 761-64 (W.D. Okla. 1984)[7], Barry Switzer, the head football coach at the University of Oklahoma and a well-recognized "celebrity" in Oklahoma, traded on nonpublic information about an upcoming merger between two corporations. Switzer had obtained the

---

[7] Even though *Switzer* was decided before the Supreme Court's adoption of the misappropriation theory, the rationale for imposing insider trading liability remains the same - mere possession of information rightfully acquired is not enough to impose insider trading liability on an outsider of a corporation absent a breach of a fiduciary or fiduciary-*like* duty.

information when he overheard an insider of the corporation discussing facts about an upcoming

merger with his wife at a high school sporting event. Switzer, who had a special interest in the oil

and gas industry, knew of the insider's position as CEO because the insider was a large supporter

of the Oklahoma football team. Thus, when Switzer overheard the CEO discussing the merger

with his wife, he was in a unique position to comprehend the materiality of the information

because Switzer personally knew that the person revealing the information was the CEO of a

large oil and natural gas exploration company based in Oklahoma City. The court concluded that

Switzer, although he traded on material nonpublic information, was not liable for insider trading

because, as in *Chiarella*, mere possession of material nonpublic information is insufficient to

impose liability.

In *Switzer*, as in the case at bar, the insider did not disclose the information for an

improper purpose, and thus Switzer (as McPhail) did not have a duty to the insider, or to the

shareholders of the corporation, to abstain from trading on the information or disclosing the

information to others. Likewise, just as Rule 10b-5 does not bar trading by an outside investor

who is in a unique and non-fiduciary-like position to ascertain the materiality of nonpublic

information, Rule 10b-5 also should not bar trading by outside investors who are in a unique,

non-fiduciary-*like* position to obtain rightfully acquired unsolicited, nonpublic information. See

Starkey De Soto, *"Well, Now I'm Screwed": The Ever-Expanding Liability For Outsider Trading*

--  33 Whittier L. Rev. 275 (Winter 2012).

The broader point is that Rule 10b5-2 is not an exception to or supplement to the

fiduciary duty rule, but rather swallows the fiduciary rule whole, tears up *O'Hagan* and

*Chestman*, and eviscerates any real element of fraud from the misappropriation theory. See 4

Bromberg & Lowenfels on Securities Fraud § 6:510.59 (2d ed.).

Logically, if McPhail legitimately received the inside information, without an articulated restriction from the AMSC executive, there could be no wrong-doing by McPhail, or down-stream fraud, when the information was disclosed to persons who traded.  Other than being a friend and golfing buddy of the executive, there is no allegation in the Indictment that McPhail had an overt business or other relationship with the executive from which one might infer an obvious (or historic) and naturally occurring fiduciary relationship of trust and confidence with the insider.

The Rule does not alter the requirement that a fiduciary duty, or its functional equivalent, must exist and be breached for an insider trading violation.  Such a duty can only exist where there is explicit acceptance of a duty of confidentiality or where such acceptance is mutually implied by the parties from a similar relationship of trust and confidence between the parties. See *United States v. Falcone*, 257 F.3d 226, 234–35 (2d Cir. 2001).  To bind both parties, the *expectation* of confidentiality must be mutual and communicated to and by the respective parties in some fashion. See *United States v. McGee*, 763 F.3d 304, 311 (3d Cir. 2014) ("Deception through nondisclosure, therefore, is the crux of insider trading liability").  Receiving confidences from a social friend, without *more*, does not make the recipient a fiduciary or create a fiduciary-*like* relationship, or any relationship of trust and confidentiality, with the provider of the information.

Without a fiduciary duty and a subsequent breach there can be no insider trading liability.

### a.   THE INDICTMENT LACKS ANY ALLEGATION OR FACTUAL BASIS TO SUPPORT ANY MUTUAL AGREEMENT ARISING FROM THE PARTIES' RELATIONSHIP AS FRIENDS.

In *SEC v. Mayhew*, 916 F. Supp. 123, Fed. Sec. L. Rep. (CCH) ¶99070 (D. Conn. 1995), aff'd and remanded on other grounds, 121 F.3d 44 (2d Cir. 1997), a pre-10b5-2 Rule decision, the court held that liability may be imposed under 17 C.F.R. § 240.10b-5 (Rule 10b-5) on a corporate

insider who discloses material, nonpublic information to an outsider in breach of his or her

fiduciary duty to the corporation's shareholders. Under the misappropriation theory, the court

went on, a person violates Rule 10b-5 when he or she misappropriates material, nonpublic

information in breach of a *fiduciary duty* or similar trust and confidence and uses that

information in a securities transaction. The phrase "similar relationship of trust or confidence,"

said the court, has been interpreted to mean the functional equivalent of a fiduciary relationship.

In the instant case, the nature of the relationship between McPhail and the executive,

from which the fiduciary-*like* duty arose is set out in ¶ 9a as involving a "history, pattern, and

practice of sharing confidences" – a mimic of the wording of SEC Rule 10b5-2(b)(2).  Rule

10b5-2(b) sets forth certain circumstances that create a relationship upon which

misappropriation liability may be premised, including: … "(2) Whenever the person

communicating the material nonpublic information and the person to whom it is communicated

have a history, pattern, or practice of sharing confidences, such that the recipient of the

information knows or reasonably should know that the person *communicating the material*

*nonpublic information* expects that the recipient will maintain *its* confidentiality." 10b5–2(b)

Thereafter, in the second clause of the first sentence of ¶ 9a, without further defining,

listing or qualifying the type(s) of confidences historically shared between McPhail and the

executive, the government claims that an "understanding" existed that presumably all

"information conveyed between them was to remain confidential".  This un-corralled

description of *information* is not found in the Rule. Unlike the parroting employed in describing

the origin of the *duty*, the Indictment varies from the SEC Rule when describing the kind and

nature of things embraced within the *understanding*.

The same general description of the relationship between McPhail and the executive is

described in ¶11 of the Indictment.  There, the government alleges:

> By in or about 2009, McPhail and [the insider] had a relationship of trust and confidence, including a history, pattern, and practice of sharing professional and personal confidences, and the two men had an *understanding* that information conveyed between them was to remain confidential. McPhail knew that [the insider] had a senior position at AMSC and had access to material, nonpublic information about the company that was supposed to remain confidential. McPhail knew and reasonably should have known that [the insider] *expected* that McPhail would keep confidential information he received from [the insider].

Thus, in the context of the two slightly different formulations of the *duty* and the genesis of the duty, the issue is whether *a relationship of trust and confidence*, and *a duty of trust and confidence*, can be created and pleaded generally without the requirement to set forth the pre-existence of an actual mutual agreement between the parties to keep confidential the specific information (or at least *genre* of information) relevant and transmitted in this case. Otherwise, the way McPhail is alleged to be bound to the *understanding* of maintaining confidentiality is not by a mutual agreement with the insider; not by a history, pattern or history of maintaining confidences; but, rather because he "knew or *reasonably should have known* that [the insider] *expected* [him] to keep confidential the information he received from [the insider]." An expectation by one party that something will happen is not an agreement between two parties that it will happen. Without an allegation of a corresponding explicit agreement by McPhail to maintain confidences generally, or the non-public information specifically, the insider's expectation does not create a duty on McPhail to maintain the confidence of the inside information disclosed by the executive.

There is no allegation in the indictment that the insider asked McPhail not to disclose the inside information; that McPhail agreed to not disclose the inside information; or that a fiduciary relationship existed between McPhail and the insider which would create a recognized duty of nondisclosure.

The textual construct of the Rule appears to refer to two distinct agreements: First, a prior (antecedent, and still existing) agreement of trust and confidence relating to matters outside the *genre* of "non-public information" ("a history, pattern, or practice"), and a second agreement, that has its genesis in the antecedent agreement and embraces the separate act(s) of providing and receiving "non-public information".  Therefore, even under the Rule, the indictment must allege and demonstrate factually the necessary mutuality for an explicit agreement derived from the past relationship referred to in the Rule.  *McGee*, p. 313 ("In *O'Hagan,* … the Court stressed that misappropriation liability extends to "those who breach a recognized duty.")

The mutuality of the parties' understanding can be shown by words, acts or by showing the reciprocal nature of the act of communicating confidential information (or a series of such acts) and a concordant refrain from disclosure by the recipient.  See *McGee*, p. 317.  The Rule itself indicates that the nature and contours of the past agreement is what must cause the recipient to treat the subject non-public information the same as the past information. The past understanding (if any) shapes the obligations between the parties.

McPhail submits that without establishing mutuality in the antecedent similar relationship, that relationship cannot support an inference that the present information must be encumbered with confidentiality, notwithstanding Rule 10b5-2(b)(2).  It is only from the mutuality of the past agreement through which the alleged obligation to maintain the new information confidential can arise.

For one to possess the requisite deceptive state of mind to be liable for the disclosure of non-public information, he must have agreed to not disclose the information passed between the respective parties.  See Final Rule: Selective Disclosure and Insider Trading, SECURITIES AND EXCHANGE COMMISSION, 17 CFR Parts 240, 243, and 249, Release Nos. 33-7881, 34-

43154, IC-24599, File No. S7-31-99, RIN 3235-AH82, where the SEC explained:

> We are adopting Rule 10b5-2 substantially as proposed. … we provide that a duty
> of trust or confidence exists when two people have a history, pattern, or practice
> of sharing confidences such that the recipient of the information knows or
> reasonably should know that the person communicating the material nonpublic
> information expects that the recipient will maintain its confidentiality. …. Some
> commenters were concerned that, as proposed, this provision examined the
> reasonable expectation of confidentiality of the person communicating the
> material nonpublic information rather than examining the expectations of the
> recipient of the information and/or both parties to the communication. We believe
> that mutuality was implicit in the proposed rule because an inquiry into the
> reasonableness of the recipient's expectation necessarily involves considering the
> relationship as a whole, including the other party's expectations. Nevertheless, we
> have revised the provision to make this mutuality explicit.

SEC Rule 10b5-2 is designed to ease the SEC's (or other plaintiffs') burdens by shifting to the trader with material nonpublic information at least part of the burden of disproving a violation, specifically the burden of showing that the exchange of some confidences did not create a duty with respect to all confidences.  See 4 Bromberg & Lowenfels on Securities Fraud § 6:497 (2d ed.).  Such burden shifting, although possibly permissible in a civil context, cannot be imposed in a criminal case. To the extent the Rule purports to create a duty of confidentiality, and, therefore proscribe divulgence, the promulgation of the Rule exceeds the authority of the SEC unless it requires a mutual agreement or understanding of confidentiality.

Reinforcing the need for a mutual agreement, the court in *McGee* noted that "[c]onfidentiality was not just Maguire's unilateral hope; it was the parties' expectation. It was *their* understanding that information discussed would not be disclosed or used by either party." *McGee* at 317 (emphasis added).  By analogy see the pre-Rule case of *United States v. Chestman*, 947 F.2d 551, 571 (2d Cir.1991) ("While acceptance of [a duty of confidentiality] may be implied, it must be implied from a pre-existing fiduciary-*like* relationship between the parties").

The superseding indictment fails to allege the existence of a mutual antecedent

understanding between the parties to maintain in confidence the information divulged between them. There are no facts alleged that the disclosure of the "inside information" related in any way to the friendship relationship.  Compare *McGee* at 318, citing *McGee,* 955 F.Supp.2d at 470 ("… [t]here was sufficient evidence from which a rational fact finder could have found that a confidential relationship existed *and* the inside information was disclosed *within the confines of that relationship*.") (emphasis added)

In *McGee*, Judge Aldisert noting that he was dealing with a matter of first impression, ruled "Rule 10b5–2(b)(2), under which a duty of trust or confidence may arise from a history, pattern, or practice of sharing confidences, did not exceed the rulemaking authority of Securities and Exchange Commission (SEC) [and] that the evidence established that defendant shared a relationship of trust or confidence with corporate insider." *McGee* at 312.   However, Judge Aldisert cautioned: "Although we are not without reservations concerning the breadth of misappropriation under Rule 105b–2(b)(2), it is for Congress to limit its delegation of authority to the SEC or to limit misappropriation by statute. It is not the role of our Court, even if the agency's reading differs from what the court believes is the best statutory interpretation. *Id*., at 316.

In *McGee*, the Court focused on the already existing "history, pattern, or practice of sharing confidence" as the springboard "from" which "a duty of trust or confidence may arise," and specifically relied on several important aspects of the McGee/Maguire relationship not present in the instant case.  *McGee* found that "[g]iven the sensitive nature of their communications, McGee *assured* Maguire [the executive] that their conversations were going to remain private." Nothing can be any more *explicit* then McGee's statement.  No such allegations are made in this case – neither McPhail nor the executive make any such assurance to one

another. Further, finding the already existing mutual understanding to keep matters confidential, *McGee* emphasized that in order "[t]o achieve this purpose [sobriety], they shared intimate details about their lives to alleviate stress and prevent relapses."  *Id.*, at 309.  In addition, *McGee* explained that this understanding of confidentiality "comported to the general practice in AA, where a 'newcomer can turn ... with the assurance that no newfound friends will violate confidences relating to his or her drinking problem.'" *Id.*  There are not any similar circumstances alleged in the instant Complaint. Instead, the intimate details shared by McPhail were allegedly the basis for a letter by the executive to the golf club president.  That hardly bespeaks a history or pattern of confidentially.

An understanding between friends and golf-buddies that each will keep their golf scores and lapses of adherence to the rules of the game in confidence cannot *sua sponte* morph into a broader and more inclusive understanding embracing other, different in kind, information.  The understanding to keep a confidence cannot be expanded unilaterally or by silence. The fiduciary or quasi fiduciary-*like* relationship cannot be defined or amended without a subsequent mutual agreement by the parties. See 2 Franch & Distr Law & Prac § 8:34 – "Courts are generally reluctant to find fiduciary relationships in the absence of a manifestation of consent by both parties."

Under Rule 10b5-2(b)(2), it is still mutuality which creates the fiduciary-*like* duty of confidentiality.

## II.   THE INDICTMENT DOES NOT ALLEGE OR FACTUALLY ESTABLISH A BENEFIT FLOWING TO THE INSIDER IN EXCHANGE FOR DISCLOSURE OF THE NON-PUBLIC INFORMATION.

In *United States v. Whitman*, 904 F.Supp.2d 363 (S.D.N.Y. 2012), a case, like the instant matter, involving a secondary tippee, the Court analyzed and debunked the position, usually

taken by the government, that it need only show that the tippee knew (or recklessly disregarded) that the information he was obtaining was an unauthorized disclosure by some inside tipper, but not that he also knew of any benefit provided to the tipper.  The *Whitman* Court reviewed the government's position and its resort to *United States v. Falcone*, 257 F.3d 226, 234 (2d Cir.2001); *United States v. Mylett*, 97 F.3d 663, 668 (2d Cir.1996); and *United States v. Libera*, 989 F.2d 596, 600 (2d Cir.1993) and decided that "[b]y contrast, the purpose of a prosecution premised, as here, on a *Dirks* approach is to protect shareholders against self-dealing by an insider who exploits for his own gain the duty of confidentiality he owes to his company and its shareholders. *Whitman*, at 370-371.  The element of self-dealing, in the form of a personal benefit—whether immediate or anticipated, and whether substantial or very modest—must be present. *Id.*, at 370-371. Therefore, the *Whitman* Court ruled that to be held criminally liable for insider trading, the secondary tippee must have a general understanding that the inside information was obtained from a corporate insider who breached a duty of confidentiality in exchange for some personal benefit.  See also, *In the Matter of Gregory T. Bolan, Jr. and Joseph C. Ruggieri*, File No. 3-16178; Release No. 2309 / February 12, 2015 ("Boland").

Accordingly, if the only way to know whether the tipper is violating the law is to know if the tipper is anticipating something in return for the unauthorized disclosure, then the tippee must have knowledge that such self-dealing occurred, for, without such a knowledge requirement, the tippee does not know if there has been an *improper* disclosure of inside information. See *United States v. Rajaratnam*, 802 F.Supp.2d 491, 498–99 (S.D.N.Y.2011). But, there is no reason to require that the tippee know the details of the benefit provided; it is sufficient if he understands that some benefit, however modest, is being provided in return for the information.

The *Whitman* court, anticipating complaints that proof of such a requirement would be difficult, said:

> … one can imagine cases where a remote tippee's knowledge that the tipper was receiving some sort of benefit might be difficult to prove. If, however, this is an unfortunate "loophole," it is a product of the topsy-turvy way the law of insider trading has developed in the courts and cannot be cured short of legislation.

*Whitman*, at 372.  See also, *SEC v. Yun*, 327 F.3d 1263 (11th Cir.2003) for the view that personal benefit is also a requirement of liability under the misappropriation theory.  The benefit does not need to be financial or tangible in nature; it could include, for example, maintaining a useful networking contact, improving the reputation or power within the company, obtaining future financial benefits, or just maintaining or furthering a friendship.

In *SEC v. Obus*, 2012 WL 3854797 (2d Cir. Sept. 6, 2012) (Obus II) (Walker, Jr., J.), the Second Circuit vacated summary judgment in favor of the defendants in a civil SEC enforcement action alleging insider trading in violation of Section 10(b) and Rule 10b-5.  The Second Circuit's decision addressed the standard for tipper and tippee liability in insider trading actions brought under the misappropriation theory.  The *Obus* court held that "tipper liability requires that (1) the tipper had a duty to keep material non-public information confidential; (2) the tipper breached that duty by intentionally or recklessly relaying the information to a tippee who could use the information in connection with securities trading; and (3) the tipper received a personal benefit from the tip." *Id*. at *10.  "[T]he tipper must know that the information that is the subject of the tip is non-public and is material for securities trading purposes, or act with reckless disregard of the nature of the information." *Id*. at *8. "[T]he tipper must [also] know (or be reckless in not knowing) that to disseminate the information would violate a fiduciary duty." *Id*.

Relevant to the case at bar, the *Obus* Court went on to hold that "… tippee liability can be established if a tippee knew or had reason to know that confidential information was *initially*

27

obtained and transmitted *improperly* (and thus through deception), and if the tippee intentionally or recklessly traded while in knowing possession of that information." *Id*. (emphasis added).  To be transmitted "improperly," there would need to be a benefit flowing from the original tippee to the tipper.

*Obus* further explained that cases involving "chains of tipping … follow [this] same basic analysis[.]" *Id*. at *10. "The first tippee must both know or have reason to know that the information was obtained and transmitted through a breach, and intentionally or recklessly tip the information further for her own benefit." *Id*. "The final tippee must both know or have reason to know that the information was obtained through a breach, and trade while in knowing possession of the information." *Id*.

On December 10, 2014 the Second Circuit Court of Appeals rendered its decision in *United States v. Newman*, No. 13-1837-CR, 2014 WL 6911278, at *1-14 (2d Cir. Dec. 10, 2014).[8]  The *Newman* court, relying on the holding in *Dirks*, says, in substance, that two dependent circumstances must come together to establish criminal liability: *First,* [the tippees's] liability derives *only* from the tipper's breach of a fiduciary duty, *not* from trading on material, non-public information, and *Second,* the [] insider has committed no breach of fiduciary duty unless he receives a personal *benefit* in exchange for the disclosure….." *Newman*, at 447. (emphasis added; internal citation deleted).  The *Newman* court's holding was not a new formulation of insider trading liability, but a re-affirmation of the Supreme Court's decision in *Dirks v. SEC*, 463 U.S. 646 (1983).

Most relevant to the arguments made herein, the *Newman* court ruled that "[f]or purposes of insider trading liability, the insider's disclosure of confidential information, standing alone, is

---

[8]   The ruling in *Newman* would have been dispositive of the crimes alleged in the original criminal Indictment.

not a breach." To be a breach of a duty to the company and its shareholders, the disclosure of inside information must have been divulged *in exchange for a personal benefit* received by the insider. *Newman*, at 450. The *Newman* court further held, "… without establishing that the tippee knows of the personal benefit received by the insider in exchange for the disclosure, the Government cannot meet its burden of showing that the tippee knew of a breach." *Id*.

Explaining its reasoning, the *Newman* court announced that "*Dirks* counsels us that the exchange of confidential information for personal benefit is not separate from an insider's fiduciary breach; it *is* the fiduciary breach that triggers liability for securities fraud under Rule 10b–5. *Newman*, at 447-448.

Summarizing its holding and setting out the required elements for insider trading, the *Newman* court, stated:

> In sum, we hold that to sustain an insider trading conviction against a tippee, the Government must prove each of the following elements beyond a reasonable doubt: that (1) the *corporate insider was entrusted with a fiduciary duty*; (2) the *corporate insider breached his fiduciary duty* by (a) disclosing confidential information to a tippee (b) in exchange for a personal benefit; (3) the tippee knew of the tipper's breach, that is, he knew the information was confidential and divulged for personal benefit; and (4) the tippee still used that information to trade in a security or tip another individual for personal benefit.

*Newman*, 450 (citations omitted)

In light of the decision in *Newman*, McPhail anticipates the government will argue that the focus of the analysis, *vis-à-vis,* benefit, is not the AMSC executive (insider), but, rather is moved one rung down the tipper/tippee ladder and directed at McPhail, the initial tippee and secondary tipper. The government will argue that under the misappropriation theory the initial tippee, who receives the inside information permissibly, thereafter commits a crime when he discloses the inside information in breach of a fiduciary-*like* duty to the insider and receives a benefit from the second tier tippee.

As seen above, *Newman* and *Obus* always refer to the recipient of the necessary benefit as the *insider*. Decisions analyzing the necessity to allege and prove a *benefit* inuring to the individual providing non-public information in cases prosecuted under the misappropriation theory sometimes loosely use the terms *insider* and *tipper* to describe the persons who possess and disseminate inside, non-public information. Without a further modifier to describe the individual to whom the moniker is directed, the question of who must receive a benefit becomes muddled because the name (designation) is fleeting and only describes the individuals at a particular moment in time, which can change depending on subsequent events. Thus, an individual can be both a *tippee* and a *tipper* at the same time.

Because the victim of insider trading is, and can only be, the stockholders of the company, the same kind of confusion inures when using the concept that the duty owed to the stockholders is derivative under the tipper/tippee paradigm. So, when the information is further disclosed by the non-corporate tippee, the individual has thrust upon him all the duties and responsibilities of a corporate individual merely by having been provided non-public information. The *duty* of an insider is passed on, but the non-corporate individual does not thereby become an *insider*.

P*roviding inside information* does not necessarily mean that each iterative transmission of the information transforms the transmitter into an *insider*. A *tippee* can become a *tipper* by a further transmission of the non-public information, but an *outsider* can never become an *insider* irrespective of whether he subsequently transmits non-public information entrusted to him. Therefore, in the search for the answer of *who* must receive the benefit, in order for the stockholders to have been defrauded, correctly identifying the tipper/tippee in relation to each transmission does not end the inquiry; the way by which the initial tippee received or obtained

the non-public information must also be considered in the calculus.

This specific point (argument) was presented, Post-*Newman*, by the SEC in *In the Matter of Gregory T. Bolan, Jr. and Joseph C. Ruggieri*, File No. 3-16178; Release No. 2309 / February 12, 2015 ("Boland").

The issues addressed in *Boland* were "(1) whether, in an insider trading case brought under a misappropriation theory, the Division must establish that the tipper received a personal benefit for allegedly tipping material, non-public information; and (2) whether the Division's alleged evidence may satisfy that requirement.) *Id*.

The Administrative Judge in *Boland* began his analysis by noting that "[i]nsider trading is not actionable under the antifraud provisions of the federal securities laws based on the mere disclosure or use of material, non-public information, but requires a breach of a duty to disclose, or abstain from disclosing, the information that 'aris[es] from a relationship of trust and confidence between parties to a transaction.'" *Id*., citing *Chiarella v. United States*, 445 U.S. 222, 230 (1980); *see id*. at 233-35.  The "parties to a transaction" are the buyers and sellers of the stock.  The conversation at which non-public information is disclosed is not a *transaction*.

The *Boland* judge went on to say that "[i]n *Dirks v. SEC*, the Supreme Court defined a breach of duty as follows:

> Whether disclosure is a breach of duty therefore depends in large part on the purpose of the disclosure. This standard was identified by the SEC itself in *Cady, Roberts*: a purpose of the securities laws was to eliminate "use of inside information for personal advantage." 40 S.E.C. 907, 912, n. 15 (1961). . . . Thus, the test is whether the *insider* personally will benefit, directly or indirectly, from his disclosure. Absent some personal gain, there has been no breach of duty to stockholders. And absent a breach by the *insider*, there is no derivative breach.

*Id*., citing 463 U.S. 646, 662 (1983) (internal citation altered)(emphasis added). Again quoting from *Dirks*, the judge in *Boland* said: "This requires courts to focus on objective criteria, *i.e.*,

whether the insider receives a direct or indirect personal benefit from the disclosure, such as a

pecuniary gain or a reputational benefit that will translate into future earnings." *Dirks* at

663.

Setting the predicate for his ultimate ruling, the *Boland* judge reasoned:

In a misappropriation case—the Division's theory for the present proceeding—the breach is not based on a duty owed by a corporate insider to shareholders, but on a duty owed to the source of the confidential information. *See SEC v. Obus*, 693 F.3d 276, 284 (2d Cir. 2012).

Finding the Division's theory unpersuasive, the *Boland* judge said:

In *Obus*, the Second Circuit made clear: "The Supreme Court's tipping liability doctrine was developed in a classical case, *Dirks*, but the same analysis governs in a misappropriation case." *Id.* at 285-86. The court then applied the *Dirks* personal benefit requirement. *Id.* at 291-92 & 293 n.5.

Based on the above cases and reasoning, the *Boland* judge held, that "contrary to the

Division's position, when the Second Circuit reconfirmed this principle in *United States v.*

*Newman*, it was not mere *dicta*, but citing established law. *See* 773 F.3d 438, 446 (2d Cir. 2014)

("The elements of tipping liability are the same, regardless of whether the tipper's duty arises

under the 'classical' or the 'misappropriation' theory." (citing, *Obu*s, 693 F.3d at 285-86))."

**ARGUENDO**, even if it is ultimately determined that McPhail is the focus of the benefit

inquiry, the *Boland* judge indicated that friendship alone, "without more, does not necessarily

establish that the personal benefit element has been met. Looking to *Newman* for guidance, the

*Boland* judge quoted:

We have observed that "[p]ersonal benefit is broadly defined to include not only pecuniary gain, but also, *inter alia*, any reputational benefit that will translate into future earnings and the benefit one would obtain from simply making a gift of confidential information to a trading relative or friend." *United States v. Jiau*, 734 F.3d 147, 153 (2d Cir. 2013) (internal citations, alterations, and quotation marks deleted). This standard, although permissive, does not suggest that the Government may prove the receipt of a personal benefit by the mere fact of a friendship, particularly of a casual or social nature. If that were true, and the

Government was allowed to meet its burden by proving that two individuals were alumni of the same school or attended the same church, the personal benefit requirement would be a nullity.

Further expounding on the *benefit* aspect of the issue, and continuing to quote from *Newman*, the *Boland* judge ratified the reasoning in *Newman*, quoting:

> To the extent *Dirks* suggests that a personal benefit may be inferred from a personal relationship between the tipper and tippee, where the tippee's trades "resemble trading by the insider himself followed by a gift of the profits to the recipient," *see* 463 U.S. at 664, we hold that such an inference is impermissible in the absence of proof of a meaningfully close personal relationship that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature.

*Boland* concluded by saying: "In other words, as Judge Walker noted in *Jiau*, this requires evidence of 'a relationship between the insider and the recipient that suggests a *quid pro quo* from the latter, or an intention to benefit the [latter].'"  *Id.*, citing *Jiau*, 734 F.3d at 153.

For all of the reasons set forth herein and at the hearing on this matter, Eric McPhail asks that the Superseding Indictment be dismissed.

<div style="margin-left: 50%;">

Respectfully submitted,
Eric McPhail, defendant
By his attorneys,

/s/ *Thomas R. Kiley*

/s/ *William J. Cintolo*

_____

Thomas R. Kiley, BBO No. 271460
William J. Cintolo, BBO No. 084120
COSGROVE EISENBERG & KILEY
One International Place, Suite 1820
Boston, MA 02110
617.439.7775 (tel) – 617.330.8774 (fax)
WCintolo@CEKLaw.net

</div>

Dated: March 2, 2015

### Certificate of Service

I, William J. Cintolo, hereby certify that on this date, March 2, 2015, a copy of the foregoing document has been served via electronic filing upon all registered parties, including Assistant U.S. Attorney(s)

/s/ *William J. Cintolo*
_____
William J. Cintolo