UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ] | |
| | ] | No.   14-CR-10201-DJC |
| v. | ] | |
| | ] | |
| ERIC MCPHAIL and | ] | |
| DOUGLAS PARIGIAN | ] | |

**GOVERNMENT'S MEMORANDUM IN OPPOSITION TO
DEFENDANT ERIC MCPHAIL'S MOTION TO DISMISS
INDICTMENT FOR FAILURE TO ALLEGE A CRIME**

The government hereby submits this memorandum in opposition to defendant Eric McPhail's motion to dismiss the superseding indictment (docket entries ##50-51).

The arguments in McPhail's motion substantially overlap with those in the earlier motion to dismiss filed by defendant Douglas Parigian (## 40-41). Consequently, the government does not repeat the entire legal discussion from its memorandum in opposition to Parigian's motion, but focuses on defense arguments more specific to McPhail's motion. The government incorporates herein its memorandum in opposition to Parigian's motion to dismiss (#44).[1]

**I.    The Indictment Tracks the Charging Language of Rule 10b-5 and of Rule 10b5-2, Which Is the Rule Governing Misappropriation Cases**

The first and second indictments both allege insider trading on a misappropriation theory. Both indictments, at ¶¶ 9(a) and 11, assert that Person A (the corporate insider) and McPhail (the outsider) had a relationship giving rise to a duty of trust and confidence; both indictments, at page 4, bear the heading, "McPhail's Use of Email to Convey Material, Nonpublic Information

---

[1] In case it is useful to the Court, the government also notes that several briefs on the same issues have been filed (followed by short follow-up memoranda) in the parallel civil enforcement action against McPhail, Parigian, and others, captioned *Sec. & Exch. Comm'n v. Eric McPhail, et al.*, No. 14-CV-12958-RWZ (docket entries ## 15-16, 23-24, 25-30, 32, 33, 36-37).

*Misappropriated from Person A*" (emphasis added); and, most importantly, both indictments, at ¶ 55, expressly charge securities fraud on a misappropriation theory:

> specifically, by willfully engaging *in a scheme to misappropriate material, nonpublic information* about AMSC's finances and business activities and, while in possession of that information, to profit by buying and selling shares, and options on shares, of AMSC stock.

(Emphasis added.)

Because both indictments charge insider trading on a misappropriation theory, both indictments track (a) the language of 17 C.F.R. § 240.10b-5 ("Employment of Manipulative and Deceptive Devices"), see ¶ 55, and then (b) the language of 17 C.F.R. § 240.10b5-2 ("Duties of Trust and Confidence in Misappropriation Insider Trading Cases"), see ¶¶ 9(a) & 11.  As to the latter, the indictment makes all allegations necessary to assert a mutual relationship between Person A and McPhail, characterized by a duty of trust and confidence, and pursuant to which both men had an understanding that professional and personal confidences shared between them were to stay confidential.  *See Indictment* ¶ 11.

Tracking the language of the relevant law is, by definition, sufficient for pleading purposes – a point that has been made in past misappropriation cases.  *See, e.g., United States v. Corbin*, 729 F.Supp.2d 607, 615-16 (S.D.N.Y. 2010) (in misappropriation case, rejecting motion to dismiss based on insufficiency of alleged relationship between insider and misappropriator because indictment language tracked Rule 10b5-2(b)(1) & (2)).[2]

---

[2] *See also, e.g., United States v. Vega Molina*, 507 F.3d 511, 527 (1st Cir. 2005) (indictment sufficient where tracked statutory language); *United States v. Cianci*, 378 F.3d 71, 81 (1st Cir. 2004) (indictment sufficient if it tracks statutory language and fairly informs defendants of nature of charge).

**II.     The Relationship Between Corporate Insider and Misappropriator Need Not be a Business Relationship, "Fiduciary," or "Fiduciary-Like"**

In misappropriation cases, the relationship between corporate insider and outsider/misappropriator need not be a business relationship; in fact, the governing regulation was expressly designed to address *non*-business relationships.  The final release publication for the regulation at 17 C.F.R. § 240.10b5-2 says in part,

> Rule 10b5-2 addresses the issue of *when a breach of a family or other non-business relationship* may give rise to liability under the misappropriation theory of insider trading. The rule sets forth three non-exclusive bases for determining that a duty of trust or confidence was owed by a person receiving information, and will provide greater certainty and clarity on this unsettled issue.

*Final Rule, Selective Disclosure & Insider Trading*, 65 FED. REG. 51716, at 51716 (Aug. 24, 2000) (emphasis added).  The issue was "unsettled" because while it was relatively clear what professional relationships might suffice (*e.g*., the outside lawyer/corporate client relationship the government has previously used as an example), it was less clear what non-professional relationships count as well.

The rule, in turn, requires only that the two persons share a "duty of trust or confidence" with each other, without requiring a professional context or a fiduciary relationship:

> **§ 240.10b5-2  Duties of trust or confidence in misappropriation insider trading cases.**
>
> (a) Scope of Rule. This section shall apply to any violation of Section 10(b) of the Act (15 U.S.C. 78j(b)) and § 240.10b–5 thereunder that is based on the purchase or sale of securities on the basis of, or the communication of, material nonpublic information misappropriated in breach of a duty of trust or confidence.
>
> (b) Enumerated "duties of trust or confidence." For purposes of this section, a "duty of trust or confidence" exists in the following circumstances, among others:
>
>> . . . .
>>
>> (2) Whenever the person communicating the material nonpublic information and the person to whom it is communicated have a history, pattern, or practice of sharing confidences, such that the recipient of the

>information knows or reasonably should know that the person communicating the material nonpublic information expects that the recipient will maintain its confidentiality; or
>
>. . . .

17 C.F.R. § 240.10b-5(2)(b)(2).

As recently observed by the Third Circuit in *United States v. McGee*, applying misappropriation theory to all relationships of trust and confidence, regardless of whether professional or personal, makes sense, because the mischief misappropriation liability is intended to address is someone enjoying an informational advantage over other market participants – not because she is more skilled or did better research – but because she happens to know an insider at a major corporation. That risk of systemic unfairness is not confined to people who know each other through professional connections.[3]

There is no lack of cases applying the misappropriation theory to personal relationships. For example, in *United States v. McGee*, the insider (a financial advisor) and the misappropriator were friends who met at an Alcohols Anonymous meeting. *See* 763 F.3d 304, 309 (3rd Cir. 2014) (rejecting argument that personal friendship insufficient), *cert. denied*, 2015 WL 731874 (Feb. 23, 2015). The *McGee* decision discusses Rule 10b5-2 at length, finding it a valid exercise of the SEC's rulemaking authority. *Id*. at 310-16. In *S.E.C. v. Conradt*, another recent

---

[3] *See United States v. McGee*, 763 F.3d 304, 315-16 (3rd Cir. 2014) ("A trader's 'undisclosed, self-serving use,' . . . of confidential information, notwithstanding the parties' history of sharing confidences, chills market participation because it 'stems from contrivance, not luck,' and the informational disadvantage to other investors 'cannot be overcome with research or skill.'" (citing *O'Hagan*)), *cert. denied*, 2015 WL 731874 (Feb. 23, 2015); *S.E.C. v. Talbot*, 530 F.3d 1085, 1096-97 (9th Cir. 2008) (discussing at length policy rationale for misappropriation theory, also citing, *inter alia*, *O'Hagan*); *see also United States v. O'Hagan*, 521 U.S. 642, 658-59 (1997) ("Although informational disparity is inevitable in the securities markets, investors likely would hesitate to venture their capital in a market where trading based on misappropriated nonpublic information is unchecked by law. An investor's informational disadvantage vis-á-vis a misappropriator with material, nonpublic information stems from contrivance, not luck; it is a disadvantage that cannot be overcome with research or skill.").

misappropriation case, the insider (an associate at Cravath) and the misappropriator were roommates who confided in each other. *See* 947 F. Supp.2d 406, 407-08 (S.D.N.Y. 2013) (same). In *United States v. Corbin*, insider and misappropriator were husband and wife; in light of Rule 10b5-2 and cases preceding it the court rejected the argument that this relationship was inadequate since it was not a "recognized" or "fiduciary" relationship. *See* 729 F.Supp.2d at 614-17.[4]

Nor does the relationship between insider and misappropriator need to be "fiduciary" or "fiduciary-like," at least not in the way McPhail and Parigian contend; it can be any relationship giving rise to obligations of trust and confidence. Beyond the plain language of Rule 10b5-2, published decisions before *O'Hagan*, *O'Hagan* itself, and decisions afterward, all make this point. For example, the Second Circuit, in *United States v. Chestman*, approved the misappropriation theory several years before *O'Hagan* was decided. *See* 94 F.2d 551 (2nd Cir. 1991). It characterized "the central inquiry" as "what constitutes a fiduciary or *similar relationship of trust and confidence*" giving rise to a duty, the violation of which would suffice for misappropriation liability. *Id*. at 564 (emphasis added).[5] In turn, *O'Hagan* variously described the required relationship as a "fiduciary duty or other duty," "a duty of loyalty and confidentiality," a "duty of trust and confidence," and a "fiduciary, contractual or similar obligation." 521 U.S. at 653, 655 n.7, 663. Finally, following *O'Hagan* and other decisions,

---

[4] *See also, e.g., S.E.C. v. Rocklage*, 470 F.3d 1, 6-8 (1st Cir. 2006) (wife liable for misappropriating inside information from husband); *S.E.C. v. Singer*, 786 F. Supp. 1158, 1169-70 (S.D.N.Y. 1992) (citing, *inter alia*, close personal ties between source and recipient and noting factual nature of this inquiry).

[5] *See also, e.g., Corbin*, 729 F. Supp.2d at 614 (discussing *Chestman*).

several courts explicitly rejected the argument that the requisite relationship must bear the characteristics of a "fiduciary" relationship.

For example, in *S.E.C. v. Nothern*, the court considered whether a fund manager had a sufficient relationship with the U.S. Treasury Department to impose liability for tipping others with information Treasury had relied on him to keep confidential. *See* 598 F.Supp.2d 167, 169-70 (D. Mass. 2009). Because the Securities & Exchange Commission ("SEC") "[did] not contend that Davis owed a fiduciary duty to the Treasury," the court considered whether a "similar relationship" existed. *Id*. at 173-74. Relying on Rule 10b5-2, the court found that one did, under both Rule10b5-2(b)(1) and (2). *Id*. The court then considered whether, regardless of Rule 10b5-2, the defendant could be liable simply because he had entered a formal confidentiality agreement with Treasury.[6] The defendant argued that a bare agreement was not sufficient, because "it failed to set forth 'a relationship with the hallmarks of a fiduciary relationship.'" *Id*. at 175 (citation omitted). The court rejected this out of hand, first observing that relevant Second Circuit cases required only a "relationship of trust and confidence." *Id*. at 176 (quoting *United States v. Falcone*, 257 F.3d 226, 234-35 (2nd Cir 2001)). The court then made clear that, even putting aside Second Circuit precedent, it was

> free to determine that a 'similar relationship of trust and confidence' exists even in the absence of a scintilla of superiority or dominance [standard characteristics of a fiduciary relationship], as other courts (including some federal district courts within the Second Circuit) have done.

*Id.* (citations omitted). As the *Nothern* court noted, other courts are in accord.[7]

---

[6] The court took this step because the defendant claimed that Rule 10b5-2 did not apply to business relationships like the one at issue in Nothern, but only to non-business relationships. The court rejected that idea, but engaged in an alternative analysis nonetheless. *See id*. at 174-75.

[7] *See, e.g., S.E.C. v. Cuban*, 634 F.Supp.2d 713, 726-27 (N.D. Tex. 2009) (rejecting argument that relationship between insider and misappropriator must show signs of "superiority, dominance and

Confusion arises because courts, in line with *Chestman* and *O'Hagan*, treat as synonymous the term "fiduciary-like" (sometimes even "fiduciary") and the more general term "duty of trust and confidence." *See, e.g., S.E.C. v. Talbot*, 530 F.3d 1085, 1094-95 (9th Cir. 2008) (treating "fiduciary duty" as synonymous with "duty of trust and confidence"); *Chestman*, 947 F.2d at 568 (duty can arise from a "relationship of trust and confidence [that is] the functional equivalent of a fiduciary relationship"); *Nothern*, 598 F.Supp.2d at 173 (requiring "breach of fiduciary duty," then observing that liability requires "fiduciary relationship . . . or a 'similar relationship of trust and confidence'").

McPhail devotes over ten pages to arguing that his relationship with Person A was not "fiduciary-like" or otherwise sufficient for misappropriation liability, but in that span he

(a) repeatedly insinuates that an express agreement of confidentiality is needed, when no court so holds and Rule 10b5-2 explicitly makes clear that it is not;[8]

(b) implies that misappropriation requires some kind of "larceny" from the inside source when, as *O'Hagan*, *McGee* and countless other cases make clear, the basis for liability is really that the misappropriator "feigns fidelity" to an inside source that willingly entrusted him with the information;[9]

---

control" for duty to attach to misappropriator), *vacated on other grds.*, 620 F.3d 551 (2010); *S.E.C. v. Kirch*, 263 F.Supp.2d 1144, 1150-51 (N.D. Ill. 2003) (finding that businessmen in a group who had an unwritten policy of confidentiality owed each other a sufficient duty; declining to follow courts that have looked for indications of control or dominance); *United States v. Reed*, 601 F. Supp. 685, 705 (S.D.N.Y. 1985) (rejecting similar argument).

[8] The first prong of Rule10b5-2(b) addresses instances in which there are express confidentiality agreements, while the second prong addresses relationships where the duty of trust and confidence is implied. The third prong then addresses familial relationships. *See* 17 C.F.R. § 240.10b5-2(b)(1)-(3).

[9] *See, e.g., O'Hagan*, 521 U.S. at 653-54 ("We observe, first, that misappropriators, as the Government describes them, deal in deception. A fiduciary who '[pretends] loyalty to the principal while secretly converting the principal's information for personal gain,' . . . 'dupes' or defrauds the principal."); *McGee*, 763 F.3d at 315 (misappropriator "feign[s] fidelity to the source of the information"); *Rocklage*, 470 F.3d at 6 (misappropriation theory involves outsider "pretending to be loyal" to source "while secretly converting information obtained from them").

7

(c)      argues that the relationship between Person A and McPhail included no *mutual* expectation of confidentiality, when the indictment says the opposite;[10] and

(d)      manages to avoid mentioning Rule 10b5-2 for most of that span, even though it's the one law squarely governing this issue in this case. *See Motion* at 8-25.

When McPhail finally tackles Rule 10b5-2, he simply declares that it's wrong. *See id*. at 18 (the rule "swallows the fiduciary rule whole, tears up *O'Hagan* and *Chestman*, and eviscerates any real element of fraud from the misappropriation theory"). But every court to consider the validity of Rule 10b5-2 has declared that it's right.[11]

### III. In a Misappropriation Case, the Inside Source, Who is the Unwitting Victim of the Misappropriator's Breach, Need Not Receive Any Sort of Benefit

As discussed at length in the government's memorandum in opposition to Parigian's motion to dismiss, in a misappropriation case the inside source of the material, nonpublic information need not receive any benefit. The inside source in these cases is not part of the tipping arrangement – he is the unwitting victim of the misappropriator's breach of the duty of trust and confidence that the misappropriator owed him. *See, e.g., O'Hagan*, 521 U.S. at 653-54

---

[10] *See, e.g., Indictment* ¶ 11 ("By in or about 2009, MCPHAIL and Person A had a relationship of trust and confidence, including a history, pattern, and practice of sharing professional and personal confidences, *and the two men had an understanding that information conveyed between them was to remain confidential*. MCPHAIL knew that Person A had a senior position at AMSC and had access to material, nonpublic information about the company that was supposed to remain confidential. MCPHAIL knew and reasonably should have known that Person A expected that MCPHAIL would keep confidential information he received from Person A." (Emphasis added.)).

[11] *See United States v. McGee*, 763 F.3d 304, 309 (3rd Cir. 2014) (discussing Rule 10b5-2 at length, holding that it "is a valid exercise of the SEC's rulemaking authority"), *cert. denied*, 2015 WL 731874 (Feb. 23, 2015); *S.E.C. v. McGee,* 895 F.Supp.2d 669, 69-80 (E.D. Pa. 2012) (parallel enforcement action; "we join the numerous courts that have rejected challenges to the Rule and those that have held that a relationship of trust or confidence may be based on either an agreement or a history of sharing and maintaining confidential information."); *United States v. Corbin,* 729 F.Supp.2d 607, 617-919 (S.D.N.Y. 2010) (rejecting challenge to validity of rule, noting that "it was buttressed by a thorough and careful consideration – one that far surpasses mere reasonableness – of the ends of § 10(b)"); *S.E.C. v. Nothern*, 598 F.Supp.2d 167, 174 (D. Mass. 2009) (rejecting "novel argument" that Rule 10b5-2(b) is invalid).

(outside lawyer trades on information belonging to firm's client; "[w]e observe, first, that misappropriators, as the Government describes them, deal in deception. A fiduciary who '[pretends] loyalty to the principal while secretly converting the principal's information for personal gain,' . . . 'dupes' or defrauds the principal.").[12]

Prompted by a misreading of *United States v. Newman*, et al., 773 F.3d 438 (2nd Cir. 2014), both defendants insist that in misappropriation cases the inside source must have received a benefit.  Neither defendant can explain how this is possible when the insider is not part of the tipping arrangement and is being deceived by the outside misappropriator.  No case, in any circuit or district, has held or even seriously considered imposing a benefit requirement on the inside source in misappropriation cases, for the simple reason that it doesn't make any sense.

The defendants create the appearance of support for this proposition by misreading cases. As discussed in the government's memorandum in opposition to Parigian's motion, see *Govt. Opp*. at 9-13, beyond misreading *Newman*, Parigian presented several published decisions discussing "insider" liability as misappropriation cases when they were really classical cases.  He then misconstrued the facts of *United States v. Conradt*, a case in which guilty pleas were vacated because of insufficient evidence of benefit to the *misappropriator/ tipper* (not to the inside source he had betrayed).  *See id*. at 12-13.

---

[12] *See also, e.g., Newman*, 773 F.3d at 446 ("[T]he misappropriator *engages in deception* by pretending 'loyalty to the principal while secretly converting the principal's information for personal gain.'" (emphasis added; citing *Obus*, 693 F.3d at 285, which cited *O'Hagan*)); *McGee*, 763 F.3d at 311 (theory involves "misappropriate[ing] confidential information for securities trading purposes, in breach of a duty . . . owed to the *source* of the information" (emphasis in original; citing *O'Hagan*)); *Rocklage*, 470 F.3d at 6 (discussing misappropriation theory and *O'Hagan*, noting theory's basis in defendant, a corporate outsider, "*pretending* to be loyal to [source of corporate information] *while secretly converting information* obtained from them into personal gain" (emphasis added)); *United States v. Larrabee*, 240 F.3d 18, 21 (1st Cir. 2001) (misappropriation case, quoting *O'Hagan*).

McPhail does something similar, first presenting a summary of the decision in *United States v. Obus*, 693 F.3d 276 (2nd Cir. 2012), that simply stands for the proposition that there must be some evidence that the tipper (here McPhail, not Person A) benefited from tipping. *See Motion* at 28. Then, like Parigian, he cites out of context *Newman*'s references to "insiders" receiving a personal benefit. *Newman* is a classical case; *of course* it talks about the requirement that insiders receive a benefit from tipping. In classical cases, it is the corporate insider who is the violator, trading on inside information for his own gain or tipping others in exchange for a benefit. *See, e.g., Dirks v. S.E.C.*, 463 U.S. 646, 662 (1983).[13]

Finally, McPhail misconstrues a recent case in the SEC's administrative courts. At pages 31-32 of his memorandum, McPhail appears to argue that a ruling in the SEC administrative proceeding *In the Matter of Gregory T. Bolan*, et al., supports his argument that in misappropriation cases the inside source must receive a benefit, or that there is ongoing legal ambiguity on this issue. *Bolan* stands for nothing of the kind. In *Bolan*, a research analyst at Wells Fargo misappropriated information from his company and tipped a friend. In a ruling dated February 12, 2015, the administrative law judge ("ALJ") addressed two issues:

---

[13] *Newman* does hold that, in both classical and misappropriation cases, the tipper must expect to receive or receive a benefit. *See* 773 F.3d at 446, 448-50 (holding tipping elements same regardless of theory, and requiring benefit to tipper). Here, the tipper is McPhail. Note that the First Circuit has *not* held that tippers in misappropriation cases must receive a benefit and seems skeptical of that proposition, in keeping with Second Circuit cases before *Newman*. *See S.E.C. v. Sargent*, 229 F.3d 68, 77 (1st Cir. 2000) (observing that "[t]here is some disagreement about whether benefit to a misappropriating tipper is a required element of section 10(b) and Rule 10b–5 liability"; citing conflicting decisions and concluding that misappropriation liability "probably" does *not* require showing of benefit to tipper); *see also Rocklage*, 470 F.3d at 7 (discussing liability of wife who misappropriated information from husband and tipped brother; no mention of need to show expectation of benefit by wife in exchange for tip). In light of *Newman*, which this circuit may or may not follow, the government added more explicit "benefit" language to the superseding indictment.

>   1) whether, in an insider trading case brought under a misappropriation theory, the Division must establish that *the tipper* received a personal benefit for allegedly tipping material, nonpublic information; and 2) whether the Division's alleged evidence may satisfy that requirement.

*In the Matter of Gregory T. Bolan*, et al., No. 3-16178, Order, Feb. 12, 2015, at 1 (emphasis added; copy attached as Exhibit A).[14] The ALJ, following *Newman*, held that the tipper (the analyst at Wells Fargo) must derive some kind of benefit from the tipping. *See id*. at 2. The ALJ then held that "evidence of a close friendship" may be enough to satisfy the requirement. *See id*. at 2-3; *see also* Order, Feb. 25, 2015, at 2 ("[I]t is in my mind an open question whether and what sort of friendship may satisfy the personal benefit element in this matter.").

In contrast, under McPhail's and Parigian's theory here, the SEC could not prove the *Bolan* case without asserting that *Wells Fargo* – the inside source of the information – derived a benefit from its analyst taking the information and tipping his own friend. The ALJ does not discuss that argument.

In short, *Bolan* is like the other cases Parigian and McPhail cite for the notion that the *inside source* in a misappropriation case must have benefited from tipping the misappropriator: it in no way supports that argument, but simply reconfirms, at least in the Second Circuit, that *tippers* – whether insiders in "classical" cases or outsiders in "misappropriation" cases – must receive or expect to receive a benefit. The indictment, whether it needs to or not, alleges benefit to McPhail. *See Indictment* ¶¶ 9(e), 20, 21, 22, 26.

---

[14] The administrative docket for the *Bolan* proceeding can be found at http://www.sec.gov/litigation/apdocuments/ap-3-16178.xml.

## **CONCLUSION**

For the foregoing reasons, defendant Eric McPhail's motion to dismiss the superseding indictment should be denied.

Respectfully submitted,

Carmen M. Ortiz
United States Attorney

By:  /s/ *Andrew Lelling*
Andrew E. Lelling
Seth Kosto
Assistant U.S. Attorneys
1 Courthouse Way
Boston, MA  02210
617-748-3177
andrew.lelling@usdoj.gov

Date:  March 9, 2015

## **Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

 /s/ *Andrew Lelling*
Andrew E. Lelling
Assistant U.S. Attorney